Wilma **JUSTICE**, (Plaintiff) Appellant,

v.

**EAST ST. LOUIS CITY LINES, INC.**, a corporation, (Defendant) Respondent.

No. 49927.

Supreme Court of Missouri,

Division No. 2.

Jan. 13, 1964.

Rehearing Denied Feb. 10, 1964.

Edward P. McSweeney, Nations & McSweeney, Clayton, for appellant.

William M. Corrigan, St. Louis, for respondent.

PRITCHARD, Commissioner.

In this action for personal injuries, wherein the prayer for damages is for $150,000, plaintiff appeals from a judgment against her based upon the sustaining of defendant's motion for directed verdict by the trial court at the close of plaintiff's evidence, which the trial court stated presented no jury question.

In determining the propriety of the trial court's action, we are guided by the rule that plaintiff's evidence must be viewed in its light most favorable to her, including all favorable inferences reasonably deducible therefrom. Keeney v. Callow, Mo., 349 S.W.2d 75, 76; Bayer v. American Mutual Casualty Company, Mo., 359 S.W. 2d 748, 752. We therefore in such manner state the evidence adduced by plaintiff, but we first set forth the essential allegations of negligence contained in her petition.

Plaintiff pleads that on December 15, 1958, she was a fare-paying passenger on defendant's bus. That after she boarded the bus defendant's agents and servants in charge thereof continued to take on passengers until it became overcrowded with passengers in its seats, aisles and passageways, and particularly in the passageway to the side exit from said bus, to such an extent as to be dangerous and unsafe for passengers riding thereon and alighting therefrom. Plaintiff further alleged that when the bus stopped at its St. Louis terminus where it discharged passengers, she was compelled by reason of the overcrowded condition of the bus to wedge and squeeze between other passengers who were standing in close proximity to each other in the passageway to the side exit of the bus while attempting to alight from the bus, and she was caused to stumble and to fall from the bus to the pavement whereby she was injured. The specific assignments of the negligence of defendant, contained in paragraph 3 of plaintiff's petition which

are material to her appeal on the issue of the submissibility of her case, are set forth as follows:

"* * * (2) In permitting said bus to become so overcrowded as to be dangerous and unsafe to passengers, particularly Plaintiff, in riding therein and in alighting therefrom.

"(3) In failing and neglecting to discover the overcrowded condition of said bus and to avoid injury to this Plaintiff by clearing the passageway to the side exit so that Plaintiff could have alighted with reasonable safety.

"(4) In failing to assist the Plaintiff in going through the passageway to the side exit of said bus and in alighting therefrom so that she could have done so with reasonable safety.

* * * * * *

"(6) Defendant, through its agents, servants and employees knew, or in the exercise of the highest degree of care could have known that the movement and surge of the passengers on its said bus toward the exit doors thereof at the terminus would create a situation making it hazardous for passengers prepared to descend the steps of said exit doors to do so and alight, and particularly Plaintiff, and could have physically assisted Plaintiff in alighting, or directed the passengers to move with caution toward said exit doors, and thereby have avoided said hazardous situation and Plaintiff's resultant fall, injuries and damage, but carelessly and negligently failed so to do."

In passing over the pleadings, we mention that defendant's responsive pleading (as pertinent to the above allegations) is a general denial coupled with a plea of plaintiff's contributory negligence.

Plaintiff testified on direct examination that on December 15, 1958, she lived at 5301 Audubon, East St. Louis, Illinois. She worked in the credit office of Famous and Barr in St. Louis, Missouri. For the past

seven years, in order to get to work, she rode the bus of the East St. Louis City Lines, Rosemount Division, and on said date she caught the bus at Fifty-Third and Caseyville Avenue. She paid her fare of 25¢, and got a seat on the bus—either the last one or the second seat from the rear door, in front of it, sitting in the seat next to the window. When the bus got into downtown East St. Louis, there were no seats remaining unfilled on the bus, and there were people standing on the bus. On the trip there were bus stops, where people were waiting, which were passed by the bus. For its route, the bus goes through the downtown part of East St. Louis, over the Eads Bridge, and when it comes off the bridge, it turns onto St. Charles from which it turns into Lane B of the Rosemount Bus Line at the terminal. On the date of the occurrence in question, the bus pulled all the way to the end of the lane and stopped, and plaintiff stood up. At that time people were standing in the aisles, down in the front well, and as she stood up and turned around she noticed the back end of the bus and the back stairwell were full, and there was no space between the people standing up. There were then no seats which were not taken.

During the prior seven years that plaintiff had been riding the bus its condition was that it was always crowded similarly to the way it was on December 15, and she had felt the crowding of the people, the pressure of the people, in getting off the bus during that time.

After plaintiff got up from her seat, and the passenger who had been sitting beside her had gotten in line and was getting off the bus, plaintiff then got into line and began to move toward the rear door, which was the closer, at which time she could feel the crowding or pressure of the people behind her. As she got to the rear door, she let some people or person get off coming from the rear side—from the back of the bus. She then started to get off, and as she was going to reach for the railing and "put [her] my footstep," she was knocked

out the back door, coming to rest on the platform by the rear door, with her feet hanging over the curbing.

On prior occasions plaintiff had been knocked off balance while she was getting off the bus, but she was fortunate enough to grab hold of something and get herself upright, and she never did fall before.

In getting off the bus, no one on behalf of the bus company offered her any help, and no one from the bus company gave her any instructions as to how to get off or move, nor during the seven years previous that plaintiff had been riding the bus had there been given by the employees any physical help or instructions to passengers of the bus.

On cross-examination, plaintiff testified additionally that as she and Mrs. Russo (seated beside plaintiff) stood up, that both had to wait before plaintiff moved out into the aisle, and Mrs. Russo got out first, waiting first for one or two people (it could have been more) to go by; there were still people standing there. At the time that plaintiff moved into the location (other passengers giving way to her) that Mrs. Russo was standing in before she moved on in the aisle, the passengers were standing together in two lines (a double line in the middle of the aisle), and plaintiff then observed pushing and jostling in front of her. By "pushing and jostling," plaintiff did not mean anything unruly—but meant people who are just in a hurry to get off the bus and get off to work—just a normal flow of people who get off the bus. As plaintiff got out into the aisle she felt pushing and jostling from behind.

Concerning from the time plaintiff got out of her seat to the time that she fell, she testified on cross-examination as follows:

"Q And at that time that you were— from the time you got out of your seat till the time you sustained this fall, did you ever look behind you, ma'am?

"A No, I did not look behind me, no.

"Q   Did you observe how many people got off in front of you?

"A   No.   I was more interested in watching how—where I was going.

"Q   And I assume you have no idea of how many people got off the front door?   A   No, I don't.

"Q   I assume you don't have any idea as to how many people were behind you, if any?   A   No, I don't.

"Q   Do I understand that when you fell you were still up on the platform or on the aisle level when you fell out the door?

"A   I was just starting to take a step down.

"Q   You were stepping from the aisle level down to the first step?   A   Yes, sir.

"Q   Now, tell us what happened, ma'am, at that time?

"A   Well, before I had gotten to the door—I had just got there—I had let a person off from the rear coming this way.   I let them off first, and then I started to get off, and just when I first started taking my step I felt myself being knocked out of balance out the back door.

"Q   What did you feel that caused you to be knocked off balance?

"A   You can feel the pressure from the people from behind with their arms or their purses or whatever how they got their arms folded.

"Q   Did you feel the pressure of more than one arm?

"A   I don't know whether it was one or more arms, but you could feel them —feel them from behind.

"Q   Well, all that you could actually feel would be the person immediately behind you, could you not?

"A   As I said before, there was always two people standing in line both ways, coming from the rear and coming from the middle part of the bus.

"Q   But at the time that you got to the place where you were going to alight there was only one person, only room for one person?

"A   All around you, Mr. Corrigan, as they come in they more or less form a circle around the back of the door and one person can only get off the back of the door.

"Q   You felt some sort of pressure behind you at that time?

"A   Yes, I did.

"Q   You don't know whether it was a purse or an arm?

"A   All I know the pressure of the people from the bodies going forward. I mean when you're standing—if somebody's behind you—it's not no arm or a purse or anything, it's just the pressure.

"Q   You really don't know what it was?

"A   All I know the pressure from the people from behind.   *If it was one person, two persons or three or four or how many, I can't say."*   (Emphasis added.)

Mrs. Ann Trotter testified for plaintiff that she took the same bus as plaintiff every morning to go to work, and had done so for about four years.   Ordinarily, during that period, by the time the bus got to the St. Louis terminal, there were no seats open, and there would be passengers standing and there wouldn't be any room at all.   There would be bodily contact among the passengers on the bus in the process of getting off —they would be so closely together that getting off the bus they would brush against one another.   Mrs. Trotter stated further that December 15, 1963, the day of the accident, was just like any other day.

The parties do not seem to be in any controversy that the rule in Missouri, following the great majority of cases in the United States, is that the overcrowding with passengers by a common carrier is regarded "as a controlling, or at least, as a material, element in determining the liability of a street railway company for injuries to passengers caused by or resulting from such overcrowding." See Jordan v. St. Louis Public Service Co., 232 Mo.App. 267, 103 S. W.2d 552, 557; Annotations, 5 A.L.R. 1257, 1258; 42 A.L.R. 1329; 26 A.L.R.2d 1219. Upon the rule of liability for overcrowding, the parties cite the same cases, but they differ as to the applicability of the evidence in the case at bar to those cases. Briefly, in Jordan, supra, plaintiff's evidence showed that the streetcar in which she was riding became jammed and packed with people in the aisles and passageways and every seat was taken, and it remained in that condition up to the time plaintiff tried to get off after the car came to a stop at the usual stopping place on the streets and upon her signal. She then had to force and squeeze and wedge her way through the crowd to the exit door, where she caught her right foot on the leg or feet of one of two men standing between the railings of the exit, thereby falling to the street.

In Grubb v. Kansas City Railways Company, 207 Mo.App. 16, 230 S.W. 675, plaintiff, a nine-year-old child, was thrown down and pushed under defendant's arriving and still moving streetcar by the pressure and shoving of a waiting crowd which had been admitted through defendant's turnstiles to its platform.

In Oesch v. St. Louis Public Service Company, 228 Mo.App. 1055, 59 S.W.2d 758, plaintiff was pushed forward, fell and was injured by a large Saturday crowd surging forward to board a streetcar, which condition of collecting crowds and their rushing forward to board had existed for a number of years.

In Miller v. Public Service Coordinated Transport, 7 N.J. 185, 81 A.2d 148, 26 A.L. R.2d 1215, plaintiff, her daughter and grand-son boarded a Public Service bus and all occupied seats thereon (the grandson sitting on the daughter's lap). When the bus arrived at their destination the bus was very crowded; all the seats and all the aisle were filled; the aisle "was fully packed, the front and back, every place." Plaintiff tried her best to get through, and while so doing everybody was shoving to try to make room for her because there was no room, and as she got to the step "they just pushed me and I fell down to the street."

In Lutz v. Chicago Transit Authority, 36 Ill.App.2d 79, 183 N.E.2d 579, plaintiff's single charge of negligence in her complaint was that defendant permitted its bus to become dangerously overcrowded and that this caused her to be forcefully pushed from the bus to the street. The evidence showed that plaintiff sat near the front door in the middle of a three place seat. The bus became very crowded before it arrived at her transfer destination. It was difficult for plaintiff to prepare to get off the bus because of the crowded aisle, and a man assisted her to her feet. She reached the front door when a woman farther back called for the driver to stop so she could get off. Some woman behind plaintiff placed her hands on plaintiff's shoulders and pushed her just as the bus was coming to an unexpected stop, at which time the door opened and plaintiff was shoved out, falling over the curb and receiving injuries.

In all of the above-cited cases, the statements of the courts are to the effect that defendant carrier is held to have anticipated the actions of the crowds in surging forward and moving towards exits or entrances of the public conveyances, and in the various circumstances presented it is negligence not to take reasonable precautions for the safety of passengers.

We turn now to an examination of the facts of the instant case in order to determine whether or not plaintiff made a submissible case on her theory of defendant's negligence that the bus in question was overcrowded to the extent that the pressure

of the exiting passengers at the terminal caused plaintiff to be knocked out of the exit door and be injured.

Defendant says that plaintiff had no evidence that *at the time she fell* that the aisles and passageways were *packed* and *jammed,* or that in order to reach the rear exit of the bus plaintiff had to *force her way* and *squeeze* and *wedge* through the crowd, or that the passengers on the bus were "packed in like sardines." These are the requirements, according to defendant, to prove overcrowdedness under the above mutually relied upon cases.

We think the evidence is ample that when the bus first arrived at the St. Louis terminal, and plaintiff stood up from her seat the bus was crowded. There were no unfilled seats; people were standing in the front and back stairwells and in the aisles with no space between them. The difficulty arises with respect to what happened thereafter, considering the facts testified to by plaintiff and the reasonable inferences in plaintiff's favor deducible therefrom. While plaintiff testified that she felt the crowding or pressure of the people behind her as she went down the aisle, her testimony is further that as she reached the stairwell at the rear door she waited to let some person from the rear of the bus go ahead of her and then, as she started to step down into the stairwell, she was knocked down. She did not state that which caused her to be knocked down was that there occurred a surge, rush or push against her of the people on the bus in attempting to alight [a fact, if it happened, which is to be anticipated by a carrier, which is held to knowledge of the habits of crowds of persons on public transportation at points where it may be reasonably expected that large numbers of persons will seek to get off. 5 A.L.R. 1257, 26 A.L.R.2d 1219]. At the crucial time of her injury, plaintiff failed to show that there was any action on the part of the passengers, *acting as a crowd,* which caused her to fall. Thus the facts of this case may be distinguished from the facts showing flagrant and inconsiderate crowding and pushing in the above cited and annotated cases in all of which it was held that the plaintiffs made submissible cases of negligence based on overcrowding of the public conveyances in question.

We are aware that the granting of a motion for directed verdict is a drastic action by a trial court, and that it should be done only when all of the evidence and the reasonable inferences to be drawn therefrom are so strongly against plaintiff that there is no room for reasonable minds to differ. Nelson v. O'Leary, Mo., 291 S.W.2d 142. Irrefutably against plaintiff is the fact that she did not show by affirmative, positive evidence that there was a crowd of people on the bus, hurrying to alight at this destination, that surged against her knocking her down. She stated she did not know who was behind her. While it may be inferred that plaintiff received some impulse from behind that propelled her downward in her fall, we may not (to supply this missing fact) infer further that it was the crowd which in concerted movement did the act any more than we may infer that it was one person alone who came against plaintiff. Supplying this missing, essential fact by inference from the fact that plaintiff was knocked down would be entering the field of conjecture and speculation. This we cannot do. Osterhaus v. Gladstone Hotel Corp., Mo., 344 S.W.2d 91. The trial court did not err in granting defendant's motion for directed verdict at the close of plaintiff's evidence.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.