**Amanda WEHRKAMP, Appellant,**

v.

**WATKINS MOTOR LINES, INC., a Corporation and Hazel K. Judkins, Administratrix of the Estate of James Albert Judkins, Deceased, Respondents.**

**No. 53124.**

Supreme Court of Missouri,
Division No. 1.

Jan. 13, 1969.

Motion for Rehearing or to Transfer to Court
En Banc Denied Feb. 10, 1969.

Strop, Watkins, Roberts & Hale, by Dan Hale, St. Joseph, for appellant.

Brown, Douglas & Brown, by R. A. Brown, Jr., St. Joseph, for respondent.

Shoemaker, Reital & Colley, by Robert D. Colley, St. Joseph, for respondent Judkins.

JOHN C. CASEY, Special Judge.

Plaintiff brought this action in the sum of $25,000 for the wrongful death of her minor son Raymond Hughes who died instantly as a result of injuries sustained in a highway collision between a northbound Chevrolet two door sedan in which Raymond was riding as a passenger and an eastbound tractor trailer truck owned and operated by defendant Watkins Motor Lines, Inc., hereinafter referred to as Watkins.

Plaintiff's petition stated certain acts of negligence in driving at a high, fast and dangerous rate of speed at the time, failure to keep a careful and proper lookout, and failure to yield the right of way on the part of James Albert Judkins alleged by plaintiff to have been the driver of the Chevrolet in which her minor son, Raymond Hughes, was riding as a passenger. Both Raymond Hughes and James Albert Judkins were killed instantly in the collision and this action was prosecuted against Hazel K. Judkins, Administratrix of the estate of James Albert Judkins, deceased. The petition also alleged certain acts of negligence on the part of defendant Watkins.

At the close of plaintiff's case the trial court sustained the motion of defendant Hazel Judkins, Administratrix, for a directed verdict " * * * on the grounds that there was no evidence of negligence

as alleged in plaintiff's petition on the part of James Albert Judkins, deceased, and therefore, a directed verdict will be entered on behalf of that defendant."

Defendant Watkins' motion for a directed verdict was overruled and said defendant thereafter adduced evidence. Plaintiff offered rebuttal testimony and the case was submitted to the jury against defendant Watkins. The jury returned its verdict in favor of defendant Watkins. After plaintiff's unavailing motion for a new trial as to each of the defendants was overruled, the case was duly appealed to this court which has jurisdiction because of the $25,000 amount in controversy.

Plaintiff's first point is that "The Trial Court erred in sustaining a motion for directed verdict in favor of defendant Judkins at the close of the plaintiff's case in chief because a jury question had been made as to the identity of the driver of the Chevrolet and the carelessness of that driver, James A. Judkins." We will adopt the general format used in plaintiff's brief by first stating the facts pertaining to the collision as shown by the evidence at the time the trial court sustained the Judkins' motion.

■ We deem it expedient at this point to restate the rule that in passing upon the propriety of the trial court's action in sustaining a motion for a directed verdict, the evidence must be considered in the light most favorable to the plaintiff and the defendant's evidence must be disregarded except insofar as it may tend to aid plaintiff's case, Moore v. Eden, Mo., 405 S.W.2d 910, 914, wherein this court also said:

" '(T)he granting of a motion for directed verdict is a drastic action by a trial court, and that it should be done only when all of the evidence and the reasonable inferences to be drawn therefrom are *so strongly against plaintiff that there is no room for reasonable minds to differ.'* (Italics added.) Justice v. East St. Louis

City Lines, Inc., Mo.Sup., 375 S.W.2d 150, 155."

The collision occurred at about 8:20 p. m. on January 8, 1965, on a highway running north from St. Joseph, Missouri, toward Savannah, Missouri. That highway, then carrying both numbers U.S. 59 and U.S. 71, is referred to in the pleadings and in much of the evidence as Highway 71 and we will so refer to it in this opinion. The point of impact was near the intersection of Highway 71 with Interstate Highway 29, hereafter designated I–29, about three miles north of St. Joseph, Missouri. Highway 71 was a four lane concrete divided road running in a general north-south direction with two 13 foot lanes constituting a 26 foot concrete roadway for northbound traffic separated by a median strip from a similar 26 foot roadway for southbound traffic. At the time of the collision, I–29, then under construction, ran in a general northwest-southeast direction and was proposed to run under the dual bridges of Highway 71, a short distance north of the point of collision. However, the pavement of I–29 was not completed north of the entrance and exit ramps to and from the northbound lane of Highway 71, so that for practical purposes I–29 terminated and was blockaded some 1,500 feet southeast of Highway 71, except for the I–29 exit and entrance ramps on the east side of U.S. 71.

Traffic moving northwest on I–29 exited up a ramp that ran to the north off of the northwest bound lanes of I–29 onto the northbound lane of Highway 71 north of the bridge. Near the junction of this ramp there was a temporary type crossover which permitted vehicles going northwest off I–29 to proceed west crossing the median strip of U.S. 71 and turn left to travel south on the southbound dual lanes thereof. Similarly, south of the bridge carrying southbound traffic over the incomplete I–29 there was a "south crossover" which permitted southbound Highway 71 traffic to turn left or east to cross the median strip and the northbound lanes

of that highway and enter the ramp which ran to the eastbound lanes of I–29 then open to such traffic. The collision here involved occurred at the junction of that eastbound crossover with the northbound Highway 71 roadway.

For all purposes concerned in this case, this southern crossover was a one-way eastbound public roadway controlled by a stop sign which appeared from the photographs in evidence to be located about six feet west of the west edge of the northbound roadway. Thus motor vehicles going south on Highway 71 and turning east into such crossover were required to stop before crossing the northbound dual lanes of U.S. 71 and proceeding down the ramp to I–29.

There was substantial evidence that from the junction of that eastbound crossover with the northbound lanes of Highway 71, the topography of that highway was such that for at least three-tenths of a mile (1584 feet) south of such junction there was no valley, dip or anything else to obscure the vision of the crossover by a driver of a vehicle proceeding north on Highway 71. The atmospheric conditions on the night of the collision were such that the sky was cloudy and visibility clear. There was no evidence of any snow, rain, or dampness on the ground or vehicles.

As previously indicated both plaintiff's son and James A. Judkins were killed in the collision. Thomas D. Chastain, driver of the Watkins truck, did not testify. Plaintiff produced no eye witnesses to the collision.

Plaintiff's witness, R. D. Matthews, the investigating state highway patrol trooper, testified that while he was driving a patrol car south on U.S. 71, a few miles north of its junction with I–29, he received a call about this wreck and immediately proceeded to the scene.

The major part of the evidence in plaintiff's case relating to the facts of the collision came from the testimony of trooper Matthews, some twenty-seven photographs

received in evidence and a rough sketch drawn by the trooper and frequently used in the course of his testimony and lodged with this court.

Since defendant Administratrix adopted a substantial portion of the "Statement of Facts" set forth in plaintiff's brief, we believe it would aid in understanding the conceded facts to substitute Highway "71" for the number "59" where it appears and to quote the following from such adopted statement, as amended by using "71" as the designation for such highway.

"It was at this particular junction, that is with the southern crossover and the northbound lanes of 71 that this collision occurred (126).

"Prior to the collision the course of travel of the two vehicles was as to the Chevrolet, northbound on Highway 71 on the easternmost lane (138). The Watkins truck, southbound on 71, turning to the east onto the southern crossover (162).

"When the Trooper arrived at the scene about 8:52 p. m. on the evening of January 8, 1965 (131), he found a 1962 White tractor hooked to a semi-trailer extending across the northbound lanes of Highway 71 with the tractor facing in a northerly direction and the trailer in an east-west direction (132). Just immediately north and east of the front of the tractor was a '58 Chevrolet extensively damaged (132). The tractor was damaged on the right front corner. The damage included a portion of the front bumper and door on the right side of the tractor (132).

"The Trooper found Leonard Judkins on the ground at the north edge of the Chevrolet. He was alive and in need of medical attention (132); James A. Judkins and Raymond Hughes inside the Chevrolet, pinned in the wreckage and dead (133, 134).

"The Trooper ascertained who the driver of the Chevrolet was from what others

told him and also from the position of the bodies in the car (135). The Chevrolet was partially upside down, facing west, and up against a large upright steel highway post, which was northeast of the intersection. The deceased, identified as Raymond Hughes, the plaintiff's decedent, was on the passenger side of the right front seat (137) and the deceased person, identified as James A. Judkins, was on the left side of the front seat closest to the steering wheel (135). Both of these bodies were still in the front seat (135). These two men were practically grown men, their bodies intact. "Prosecuting Attorney of Andrew County, Alden Lance, came to the scene. Mr. Lance took Jim Judkins' body from the demolished Chevrolet and he remembers specifically that 'it was in the front seat on the side where the driver would normally sit' (179).

"Damage to the Chevrolet was to the front end and the entire left side. It was more or less crushed in (136). The front seat was still intact (136).

"The Trooper observed tire marks at the scene. These tire marks started in the northbound lane of Highway 71 about five feet east of the centerline thereof, and about 50 feet south of the south crossover, and extended straight north for a distance of 52 feet to the center of the crossover, and then they veered off to the right, going toward the (east) shoulder for a distance of 27 feet and then off in a northeasterly direction for 40 feet to the point where the Chevrolet came to rest (138).

"From the position of the tractor of the Watkins truck, the Trooper identified distinct dual wheel skidmarks made by the right drive wheels of the tractor. These skidmarks led from the west edge of the northbound lanes of Highway 71 in a semi-circular fashion for a distance of 22 feet to the wheels of the tractor where it was sitting when the Trooper arrived (140).

"Trooper Matthews ascertained that the driver of the Watkins tractor was Thomas D. Chastain. Chastain made a statement to the Trooper at the scene 'I stopped here at the stop sign and I seen him coming up the road. I seen he was going to get me anyway and I didn't know what to do. I tried to turn up that way and the next thing I knew he was in my door. I even tried to back up.' (149)

"Trooper Matthews explained the black tire marks in a semicircle from the west edge of the concrete to the right drive wheels of the tractor as being drag marks made 'when the truck which had been heading east was moved to the north by the impact. The wheels drug in a semicircle leaving the tire marks on the pavement' (162). In other words, when the car struck the right side of the tractor, it moved the tractor in a northerly direction a complete 90 degrees and this movement drug the right drive wheels of the tractor so as to make the semicircle mark (162, 163).

"The intersection was well lighted from overhead lights on this evening (164). These were mercury vapor lights, which were bright lights. They cast a great amount of light and most of it is directed downward (170). The lighting would extend to the south of the intersection approximately 100 feet.

"The tractor-trailer rig was well lighted with headlamps as well as clearance lights along the sides and on the top (164, 165).

"The speed limit on Highway 71 at the place of the accident was 70 mph (175).

"This basically was the status of the facts in the case relative to liability of Defendant Judkins, when the Trial Court sustained a motion for a directed verdict in favor of the Judkins Estate, stating that as grounds for the motion 'there was no evidence of negligence as alleged in

plaintiff's petition on the part of James Albert Judkins, deceased'."

*(End of adopted statement.)*

In adopting such part of plaintiff's statement of facts the defendant administratrix added the following, which we will consider as additional agreed facts.

"Additionally, the trooper found a white, 1958 Chevrolet at the northeast corner of the intersection partially upside down against a steel highway marker with the front end of the Chevrolet facing west. (135) Leonard Judkins was on the ground just at the north edge of the top of the car. (135) Neither of the two male subjects pinned in the Chevrolet were directly behind the wheel. (175) The Prosecuting Attorney of Andrew County, Alden Lance, did not find anybody in the Chevrolet sitting up behind the steering wheel. (185)"

In addition to such adopted or agreed facts twenty-seven photographs were received in evidence, without objection by administratrix Judkins, in a pretrial hearing held by the court prior to the voir dire examination of the jurors. Six of these pictures were taken on the night of the collision at the direction and request of Prosecuting Attorney Lance by a member of the Highway Patrol and vividly showed many of the cold hard facts of the case especially with reference to the skid marks, place of impact, damage to and location of the tractor-trailer after collision and before it had been moved, damage to the Chevrolet and its position after it had been turned back on its wheels and a multiplicity of other facts. Six of the other pictures were close-up views of the vehicles after removal from the scene while the fifteen remaining photographs were various views of the scene, roads and general area taken in daylight. We will not attempt to describe such photographs here but since the same were in evidence we will allude to the facts shown and the inferences that could reasonably be drawn therefrom as the occasion arises.

In her points relied on the Administratrix first states that "The Trial Court did not err in sustaining defendant Judkins' motion for directed verdict at the close of plaintiff's case in chief because no jury question had been made as to the identity of the driver of the Chevrolet * * *."

In addition to the summary data set forth in the adopted "Statement of Facts" supra, trooper Matthews testified without objection, "The deceased males I learned were James Albert Judkins, age 21 of St. Joseph, Missouri, and Bernard Raymond Hughes, age 18, of St. Joseph, Missouri. The injured boy was Leonard Fred Judkins, age 20, of St. Joseph, Missouri." He further testified, again without objection, "The injured Mr. Judkins was on the ground just at the north edge of the top of the car. The deceased who was identified as Bernard Raymond Hughes, age 18, of St. Joseph, was on the passenger side of the right front seat and the deceased person who was identified as James Albert Judkins, age 21, of St. Joseph, was on the left side of the front seat closest to the steering wheel."

In addition, Prosecuting Attorney Lance, who took James Judkins' body from the car, stated that he remembered specifically that the body "was in the front seat on the side where the driver would normally sit, if you could say there was a front seat left." Later on cross-examination Mr. Lance stated:

"* * * I didn't find anybody sitting up behind the steering wheel, no. Both boys—one was to the right—the Hughes boy, and the Judkins boy under it. His body was jammed down under the steering wheel in that area.

Q Under the dashboard? A Yes, sir."

Coroner Wayne Maxwell, called to the scene, stated that he viewed two males, deceased, in an automobile; that the cause

of death of Raymond Hughes "was massive cerebral trauma" * * * "He had massive skull fractures. The whole skull was crushed."

Defendant Judkins further argued that "There was no testimony in the record as to the position Leonard Judkins occupied in the vehicle and the inference is just as strong that being found outside on the north side of the wrecked Chevrolet he could also have been the driver of the vehicle, especially since the entire left side of the vehicle was ripped open." Five photographs of the Chevrolet taken from various angles were discussed and described in the testimony of Trooper Matthews. These clearly showed the nature of the extensive damage to the left front and side of the Chevrolet. It would be extremely difficult, if not impossible, to accurately describe in a written opinion the full extent of the damage to the Chevrolet, and would unduly prolong this opinion to attempt to do so. However, we have closely examined such photographs, especially the views showing the front and left side of that Chevrolet, which showed crushing damage toward the steering wheel and driver's seat. The very nature of such damage, so clearly shown in the photographs, were such that a jury could well infer, find and conclude that a driver of the car seated in the usual driver's position behind the steering wheel could not possibly have been thrown out of the car in a forward direction. The same photographs clearly showed that the metal top of the Chevrolet was torn back and upward in such manner as to leave a wide aperture from the rear seat forward. The jury could, if permitted, have found that opening in the top of the car was of such size, kind and character as to warrant, if not compel, the conclusion that only a person riding in the rear seat of such two door Chevrolet could have been thrown forward out of that car and toward the front of such Chevrolet.

■ We are of the considered opinion that the evidence in this case was sufficient to permit submission to the jury of the issue as to whether James A. Judkins, deceased, had been driving the Chevrolet at the time of the fatal collision. (See Fellows v. Farmer, Mo.App., 379 S.W.2d 842, and cases therein cited, wherein the Springfield Court of Appeals reached a similar conclusion largely from the position of bodies in a wreck fatally injuring driver and passenger.)

## SUBMISSIBLE NEGLIGENCE OF DRIVER OF CHEVROLET?

In further support of the trial court's action in sustaining her motion for directed verdict at the close of the plaintiff's case, Administratrix Judkins next makes the point that "the record is devoid of any evidence in support of plaintiff's allegation of negligence against defendant Judkins, decedent." Plaintiff's petition alleged negligence on the part of decedent James Albert Judkins in that he "drove at a high, fast and dangerous rate of speed at the time", that he "failed to keep a careful and proper lookout for other motor vehicles on the highways aforementioned", that he "failed to yield the right of way to the tractor trailer rig being driven by defendant Watkins Motor Lines, Inc. at the time" and that he "was grossly and wantonly careless in each of the above specifications."

In the instant case the jury could well have found from the truck driver's statement, admitted in evidence without objection, that Watkins' truck had made a stop on the crossover at the stop sign before entering upon the concrete part of northbound 71 and that the truck then started up from a stop and proceeded east in an attempt to cross such 26 foot lane, and thereafter the collision occurred between the Watkins truck and the Chevrolet which was northbound on Highway 71.

Before going into further detail regarding the movements of the two vehicles we believe that in order to more fully understand the facts of this case, many of which

must be gleaned from photographs, we should undertake to describe the Watkins truck.

In the very first paragraph of her brief defendant Judkins argued that the weight of the tractor trailer unit owned by defendant Watkins "was not in evidence and before the Court at the time the Court directed a verdict for defendant Judkins." While it is true that at the close of plaintiff's case the exact weight was not in evidence, the trooper had testified that the tractor was eight or nine feet high by nine or ten feet long, and that the trailer was about 12½ feet high by 40 feet in length.

From a careful study of the photographs in evidence the jury could reasonably find that the Watkins rig consisted of a modern cab-over-engine diesel tractor and a refrigerated trailer about 40 feet long, eight feet wide and over twelve feet high; that the front of the trailer was supported by a disc-type mechanism commonly referred to as a "fifth wheel" supported by two sets of dual tired drive wheels on each side of the tractor so that the tractor rode on ten tires including those of the two front wheels. The rear of the trailer was supported by two sets of dual tired wheels on each side of the trailer. The whole eighteen tire combination is of the type commonly seen en route on the major highways and near truck terminals and warehouses in cities all over the nation. In a nutshell, it is in the class of the largest, heaviest, single-trailer motor vehicles using our highways during the past decade.

In the following discussion of this case, in the light most favorable to plaintiff, we will include the facts that the jury, if permitted, might have found or reasonably inferred from the photographs received in evidence, as well as the admissions and oral testimony adduced.

Immediately prior to the collision and at about 8:20 p. m. January 8, 1965, one Chastain was driving the large Watkins tractor-trailer rig southwardly on southbound Highway 71; the truck headlights and at least three lights on each side of that trailer were burning. When Chastain reached the crossover leading to I–29 he turned to his left or eastward into such crossover and that in so doing the tractor headlights necessarily turned in a quarter circle from a southerly projection to an easterly direction, and in the course of such turn the Watkins headlights would sweep across the line of vision of the driver of any automobile proceeding northwardly on northbound 71 and within three-tenths of a mile (1584 feet) of the crossover. From the statement made by Chastain to the highway trooper, and admitted in evidence without objection, the jury could find that Chastain stopped said tractor-trailer on such crossover at the stop sign prohibiting motor vehicles moving east on the crossover from entering northbound 71 before coming to a complete stop. Such stop sign, as shown in the photographs, was approximately six feet west of the west edge of the traveled part of northbound Highway 71. From that stop sign to and beyond the point of impact, the right or south side of the Watkins tractor-trailer combination was also illuminated by at least one of the bright mercury vapor overhead lights which was located close to and south of the crossover. The right or south side of the Watkins trailer was light in color by comparison with the word WATKINS spelled out in dark, contrasting letters approximately two feet high by twenty feet long on the side of the trailer. The Watkins rig with all such lights still burning started up from a stop at such stop sign and proceeded eastwardly on the crossover leading to the ramp going into the southwest lane of I–29.

While the Watkins truck was moving in a general easterly direction it was struck by the northbound Chevrolet.

By piecing together all the data gleaned from the photographs, statement of Chastain, statements regarding skid

marks and other testimony, we are of the opinion that there was sufficient evidence adduced in plaintiff's case in chief to have warranted a finding by the jury that at the moment of impact, approximately four or five feet of the front part of the Watkins tractor had gone beyond, or east of the skid mark caused by the left wheels of the northbound Chevrolet. Thus it follows that there was sufficient evidence for the jury to have found that the Watkins truck traveled in a general eastwardly direction approximately 28 to 29 feet from the stop sign until the moment it was struck by the northbound Chevrolet. (Six feet from stop sign to west edge of Highway 71, plus thirteen feet to center of northbound roadway, plus five feet from center line thereof to Chevrolet skid mark, plus four or five feet of tractor that went east of skid mark before tractor was struck by Chevrolet.)

As previously indicated the Chevrolet was literally demolished. The photographs clearly show that the thrust of the impact, centered about the left front wheel, was almost directly from the front to the rear of the Chevrolet. We could not adequately describe all the extensive damage so shown, but the pictures were before the court and jury. The foremost thought that saturates the mind on viewing such pictures is terrific speed at impact.

The impact damage to the truck is clearly shown in the pictures to be from a crushing blow from the right side of the front of the tractor toward its left. On careful examination of all the photographs we could not find any indication of thrust of force toward the rear of the tractor. This is most vividly noted in the damage to the front bumper which appeared to be of heavy channel shaped steel. Approximately the right two feet of this bumper was smashed in accordion-like manner into almost a ball of metal shortening the right to left dimension of the bumper from about eight to about six feet. The direct impact damage to the tractor was confined to its right front four or five feet, several holes being punched through the front part of the right door which was located over the right front wheel. The axle and front end assembly were crushed to such an extent that the right wheel rested at about a 30 degree angle to the ground and the left at about a 45 degree angle. The roadway beneath the tractor appeared to be covered with a dark, shiny, oily substance. On viewing the pictures of the two vehicles, with the information that the northbound Chevrolet struck the eastbound tractor, the over-all impression gained is that of terrific speed of the Chevrolet at the moment of impact.

It is only after due consideration of the damage to the vehicles that the full import of the Highway Patrol Trooper's testimony regarding the skid marks left by the tractor drive wheels can be appreciated. Trooper Matthews testified without objection:

"Q  What caused this mark on the pavement, if you know?

"A  When the truck which had been heading east was moved to the north by the impact, the wheels drug in a semicircle leaving tire marks on the pavement.

"Q  So that when the car struck the right side of the tractor it moved the tractor in a northerly direction a complete 90°, didn't it?

"A  Yes, sir.

"Q  And with this tractor moving like this, it drug the right wheels around, so leaving those marks, is that correct?

"A  Yes."

There was also evidence from which the jury could find that after such impact the Chevrolet was still traveling at such a speed as to leave its skid marks, veering to the right, going on the concrete roadway toward the east shoulder for a distance of 27 feet and then off in a northeasterly direction for 40 feet to the point

where the Chevrolet struck the "large upright steel highway post which was northeast of the intersection" (adopted statement) with sufficient violence to catapult Leonard Judkins clear of the wreckage and bend that post from an upright position to an angle of about 45° and then overturn.

In the recent case of Housman v. Fiddyment (Mo.Sup. En Banc) 421 S.W.2d 284, 292, this court said:

"In these modern days nearly all jurors are experienced motorists. Marks and debris on highway at the scenes of collisions, examples of the damage done when automobiles collide and the result of the interaction of vehicles colliding are matters of common observation. As a result the modern-day juror in the average case is 'just as capable of reasoning backward from the evidence and making a correct analysis of what happened as is the expert.'"

Jurors are often called upon to determine questions of the speeds of motor vehicles involved in collisions. They are probably more familiar with estimating the speed of slow moving vehicles such as those starting from a stopped position and the probable rate of acceleration for the first thirty or forty feet than for vehicles traveling in excess of fifty miles per hour. As pedestrians as well as when operating automobiles, modern day jurors are often required to estimate the relative speeds and acceleration of small, fast getaway cars as well as large trucks in order to determine whether it is safe to cross a street, on foot or by car, at variable distances from different kinds of motor vehicles starting from a stopped position.

From the fact that the photographs further showed that the trailer came to a stop headed almost due east with its front end still about three feet west of the east edge of U. S. 71, the jurors could have found that despite its weight and eastward momentum the trailer had to be moving at a very slow date of speed to have stopped in such a short distance of approximately six to eight feet. This court has stated that "It is common knowledge that when a motortruck is just started it goes at a very slow rate of speed." McMillan v. Israel, Mo.App., 30 S.W.2d 626, 628. From those parts of the statement made by Chastain, driver of the Watkins truck, "* * * I seen he was going to get me anyway and I didn't know what to do. * * * I even tried to back up." there was further evidence from which the jury could have found that the average speed of the tractor trailer, after leaving the stop sign was very low. From such statements the jury could have found that after the Watkins truck got onto the highway the truck driver had to stop the truck again in order to have "tried to back it up". The jurors could have found, even without such intermediate stop, that in order to attain an average speed of as much as five miles per hour in the short distance traveled by the rig from the stop sign it would have had to accelerate to a speed of about ten miles per hour then decelerate to a stop before the front of the trailer reached a point three feet west of the east edge of the highway. The jury could have found this to have been a difficult if not impossible feat. Jurors are often required to determine questions of the speeds of vehicles involved in collisions. Under the evidence in this case counsel, if permitted to do so, could have argued and the jury could have inferred and found from the evidence and their experience that the average speed of the truck from the time it started from the stop sign until the moment of impact was about three miles per hour.

The jurors could have exercised their capabilities "of reasoning backward from the evidence and making a correct analysis of what happened" (Housman, supra) and found that the 70 miles per hour maximum speed permitted by law on northbound 71 was 23⅓ times the three mile per hour speed of the Watkins truck. The jurors could have found that a northbound

automobile moving at 70 miles per hour, without reducing its speed a whit, would travel 23⅓ times the 28 or 29 foot distance traveled by the Watkins rig during the time it took the Watkins tractor to move from the stop sign to the point of impact, or approximately 653 feet.

From these calculations the jurors could have reasoned that if the driver of the northbound automobile was moving at 70 miles per hour and was exercising the highest degree of care in keeping a lookout ahead along this three-tenths of a mile of unobstructed view highway, he could have seen the truck begin its eastward movement from the stop sign when the northbound car was about 650 feet south of the crossover. The jurors could have found, if permitted, that on seeing that Watkins truck start eastwardly from the stop sign, the driver of the northbound Chevrolet had the duty of adjusting his speed accordingly.

Regardless of the maximum posted speed limits on public highways, drivers of automobiles have the primary duty of complying with the very first part of Section 304.010, V.A.M.S., reading:

"1. Every person operating a motor vehicle on the highways of this state shall drive the same in a careful and prudent manner, and shall exercise the highest degree of care, and at a rate of speed so as not to endanger the property of another or the life or limb of any person."

These primary duties of motorists have been discussed and applied by our courts times without number to practically all situations and conditions that have contributed to highway collisions. In the recent case of Wolfe v. Harms, Mo., 413 S.W.2d 204, 210 this court said:

"However, excessive speed is a relative matter, and whether speed is excessive ordinarily depends upon the condition of the highway and surrounding circumstances."

In the instant case one of the conditions of Highway 71 was that the area about its intersection with the crossover was brightly illuminated by a number of mercury vapor lights which, in recent years, have been placed about open highways at potentially dangerous intersections. One of the circumstances in the instant case was that the southbound truck had made a left turn and, as the jury could have found from the evidence, had made a stop in an illuminated area and in a position to cross northbound Highway 71. In discussing the duty of an approaching motorist upon seeing a truck stopped at the side of a road, in a position to start across, Judge Bennick wrote, in the case of Bramblett v. Harlow (Mo.App.) 75 S.W.2d 626, 630:

"In other words, the degree of care which one is to be required to exercise at a given moment in the operation of his automobile is to be measured by the obligations of the situation which confronts him, and thus a speed which would be free from the imputation of negligence under some circumstances might easily be regarded as a very negligent and unsafe speed under other and different circumstances.

"Here Mrs. Harlow, under her own admissions, saw plaintiff's truck sitting by the roadside, in a position to go across, as soon as she came over the crest of the hill. She was thereupon charged with the necessity of taking cognizance of the probabilities of the situation, and to have her car under such control that she could reasonably avert an accident if the truck was started across the pavement, and not to wait until the actual moment of peril should arise until she should choose to act according to the dictates of due care. But instead she continued onward at what must have been a high speed under the inferences fairly deducible from plaintiff's own evidence, and thus at best contributed to bring about a situation which ultimately resulted in the collision."

In considering tire marks and the ultimate resting places of the respective vehicles with reference to the issue of excessive speed, this court said in Wolfe v. Harms, supra, 413 S.W.2d 204, 1. c. 210:

"Thus, the additional circumstances of 119 feet of tire marks leading south from the truck are available for the jury's consideration. Also available is the evidence of the ultimate resting place of the vehicles, the truck against an embankment and the Dodge to the right and forward of the truck. A jury could properly consider all these facts, and they were sufficient to make a submissible case on the issue of whether defendant negligently drove at an excessive speed and whether that was a proximate cause of the collision and resulting injures. Bramblett v. Harlow, supra, 75 S.W.2d 1. c. 630 (7–9)."

From all the facts adduced, including the Chevrolet skid marks prior to the impact, the fact that the comparatively light Chevrolet literally knocked the heavy tractor out of its path causing 22 feet of sideways skid marks of the multiple tractor tires, the tremendous damage to both vehicles, the additional Chevrolet skid marks in excess of 60 feet after such impact, the striking of the steel highway post with sufficent force to bend it, the subsequent overturn of the Chevrolet and the other conditions and circumstances heretofore discussed, we are of the opinion that plaintiff's evidence and the reasonable inferences to be drawn therefrom, was sufficient to make a submissible case on the issue of whether the driver of the Chevrolet negligently drove at an excessive speed and whether that was the proximate cause of the collision and resultant death of plaintiff's son, Raymond Hughes.

We conclude that the trial court erred in taking the drastic action of sustaining the motion of defendant Hazel K. Judkins, Administratrix of the Estate of James Albert Judkins, deceased, and that a new trial should be granted to plaintiff against said defendant.

## PREJUDICIAL ERROR IN THE ADMISSION OF EVIDENCE OF PRIOR RACE?

After erroneously sustaining defendant Judkins' motion for a directed verdict, the court announced "Defendant Watkins Motor Lines, Inc. is still in the case and may now proceed with its evidence."

In its case defendant Watkins' first witness, James D. Jackson, a traffic study engineer employed by the Missouri Highway Department testified about certain measurements.

Defendant Watkins next called Calvin Calhoun to the witness stand. Among other matters Calhoun testified, over timely objection by plaintiff, that about one-half hour before the fatal collision at issue he had a race with James Albert Judkins north along the same stretch of Highway 71 and that, although Calvin Calhoun attained a speed of 110 miles per hour, he lost the race to decedent James Albert Judkins. The court later sustained plaintiff's motion to strike such evidence and orally instructed the jury "to disregard all evidence concerning this alleged race," but the trial court refused to grant plaintiff's motion for a mistrial.

In her brief plaintiff makes a point that the court "erred in allowing testimony of Calvin Calhoun on the subject of a prior race between himself and Jim Judkins * * *." Plaintiff then proceeded to argue that the court's later action in telling the jury to disregard the testimony was insufficient. To quote from plaintiff's brief "This attempt to unring the bell came far too late."

That part of Calhoun's testimony pertaining to the race was that about 7 o'clock on the evening of the collision (which as indicated occurred about 8:20 p. m.) he saw James Albert Judkins at the Townsend service station; that Judkins then

had a white 1958 Chevrolet identified by Calhoun from the photographs of the wreck as the car involved in the collision at issue; that such Chevrolet had a special engine "built up for racing"—"the whole inside had been worked over; * * * It was built for racing and is not on a car that comes from the factory. It had been worked over." And that Jim Judkins drove into Townsend's service station in that white Chevrolet.

Thereafter, the following occurred during the direct examination by Mr. Brown, counsel for defendant Watkins:

"Q Did you have a race with Jim Judkins on this evening?

"A Yes.

"MR. HALE: We will object to this as being immaterial. Ask the witness to wait until I make by objection. (sic)

"THE COURT: Overruled.

"MR. HALE: Your Honor, may I make my objection?

"THE COURT: I thought you had. Go ahead.

"MR. HALE: I would like to object to this question of asking Mr. Calhoun if he had a race with Jim Judkins in this case as being immaterial, incompetent and irrelevant, bringing up information about what Mr. Calhoun did with a Mr. Jim Judkins. It has no bearing on this case whatsoever.

"THE COURT: Overruled.

"Q Where did you race from? A Sharp's Trailer Court up to the intersection of Interstate 29.

"Q And what? A 71 Highway."

Calhoun then testified that the northbound race took place on that part of northbound 71, so crucial to the issues in this case, viz. the last quarter mile south of its intersection with I–29.

In answer to further questions by Watkins' counsel Calhoun testified:

"Q How fast did you go? A Approximately 110 miles an hour.

"MR. HALE: We will object to further inquiry about all of this, about some race, unless it is connected up some way with this accident that we are trying.

"THE COURT: Overruled.

"A We got to approximately. one hundred ten.

"Q Did you win the race? A No, he did.

"Q Then what did you do?

"A We turned around at the intersection and raced back.

"Q To where? A About half way to Sharp's, my transmission went out.

"Q What did you do? A I limped on back to the station the best way I could get there."

Later on cross-examination of Calhoun, it was developed that Raymond Hughes was not in the car at the time of the alleged race.

Plaintiff's counsel thereafter, out of the hearing of the jury, orally moved that the testimony regarding that race in which Calvin Calhoun was involved at some other time, be stricken from the record, that the jury be instructed to disregard that testimony and that the jury be discharged and a mistrial declared. After some discussion, out of the hearing of the jury, the trial court stated to counsel "as to the evidence concerning the race, I think it was clearly inadmissible. It was too far removed in time from the time of the collision, and the motion to strike, for that reason, will be sustained. However, the request to discharge the jury will be denied."

Thereafter the trial court told the jury:

"A motion to strike the testimony of witness Calvin Calhoun concerning a

race which he had with James Albert Judkins sometime on the evening of January 8, 1965, was sustained, and all of that testimony is ordered stricken from the record and you are instructed to disregard all evidence concerning this alleged race. That has no bearing and is irrelevant and immaterial to the issues of the case."

Counsel for defendant Watkins, in their brief argument contend that the trial court's "exclusion of the erroneously admitted evidence leaves no ground for reversing this judgment because this Court should assume the jurors considered only legal evidence, and were not unmindful of their duty to obey the Trial Court's direction."

Thus we have presented the question of whether the evidence with reference to the race (conceded in defendant's brief to be erroneously admitted in evidence and found by the trial court to be "clearly inadmissible", and "too far removed in time from the time of collision" and "irrelevant and immaterial to the issues of the case") was so prejudicial as to warrant reversal of the judgment entered in favor of defendant Watkins.

In the case of Harter v. King (Mo.App.) 259 S.W.2d 94, 96, the court had occasion to pass upon somewhat similar evidence of a race occurring several hours before the collision at issue and said:

"* * * Assuming that it was proper cross-examination, which we do not decide, it was a collateral matter whether two hours before the collision at a point five miles removed from it, plaintiff failed to stop at a stop sign or raced his car with the witness at 35 or 40 miles an hour. * * *

"Defendant should not have been permitted to introduce this highly inflammatory evidence under the pretext of impeaching Mr. Wengler.

"Reversed and remanded."

After carefully reviewing all of the facts of this case we are of the considered opinion that the erroneous evidence of the "race" on an occasion prior to the trip during which the instant collision occurred was so inflammatory and prejudicial that a new trial as to defendant Watkins should be granted to plaintiff.

Plaintiff also complained of the court's action in permitting Calhoun to relate certain statements allegedly made by deceased Hughes or in his presence concerning the purpose of the trip toward Savannah. One of the complaints was that Calhoun was permitted to relate some conversation by "the boys" without full identification of the person quoted by Calhoun. Care should be exercised in order to make certain that improper hearsay evidence is not admitted over timely objections. However, in view of the result reached, we will not discuss this further since it is doubtful that the same identical wording of the questions and answers will be used on retrial.

## ERROR REGARDING CHAIN OF POSSESSION OF HEADLIGHTS AND OPINION OF EXPERT?

Plaintiff made a number of points with reference to alleged error in admitting in evidence the right front fender portion of the Judkins' Chevrolet. This fender, according to defendant Watkins' evidence was sent to one Frank M. Flannagan of Gainsville, Florida, for the purpose of having the headlights contained therein examined to determine, if possible, whether these headlights were or were not burning at the moment of the collision.

Mr. Flannagan testified that he had a master of science degree in the general field of engineering, was a professor of mechanical engineering at the University of Florida and had some twelve years' experience investigating automobile accidents. He further testified that from looking at the photographs of the Chevrolet, previously received in evidence, and noting the dam-

age to that car, he was able to estimate that the force of impact causing the Chevrolet damage was about six or seven Gs (6 or 7 times the force of gravity).

The gist of Mr. Flannagan's testimony, all given over timely and frequent objections by counsel for plaintiff, was to the effect that if the headlights were burning at the time the Chevrolet was involved in such six or seven Gs impact collision, the tungsten filament inside the headlight bulb would be bent and distorted. He further testified that if the headlights were not burning at the time of such an impact the tungsten filaments would not bend, but would remain in a normal condition. He stated that the headlights on such right front fender were not broken and that he could determine by visual inspection through the glass of the headlight that the tungsten filament was not distorted. From this inspection, over timely objection by plaintiff, he stated before the jury, "It is my opinion at the time of the impact that these lights were not burning."

Plaintiff devotes a considerable portion of her brief to many alleged errors in establishing a chain of possession of that right front fender, some of which seemingly have merit. According to the evidence of defendant Watkins, the chain of possession went from one Reardon, a wrecker operator who picked up the Chevrolet at the site, to one Dennis Clark, to one Louis Prawitz, to one Hubert Enfinger, driver for Watkins Motor Lines, to one Wallace Peterman at Thomasville, Georgia, to one David Bender to the expert witness, Frank Flannagan.

In view of the fact that this case must be tried again for other reasons set forth in this opinion, it is quite likely that many of the alleged omissions and discrepancies in the testimony will be noted by defense counsel and efforts made to supply some of the alleged missing links in the chain of possession. Under the circumstances we will not undertake to further discuss or determine this chain of possession since it is unlikely that the same evidence will be adduced on new trial.

The general rules with reference to such chain of evidence tracing possession of objects sought to be admitted in evidence are well stated in 29 Am.Jur.2d Sec. 774, and cases therein cited, and bear no need of repetition at this point.

In the event that, on retrial, the chain of evidence would be found sufficient to warrant the introduction of such fender and the attached headlights in evidence, the trial court would then be faced with the problem of the admissibility of such opinion evidence of the witness Flannagan. Since this case must be reversed for other causes, we do not deem it necessary to make a complete determination of the admissibility of all of the testimony given by the expert witness. Some of the objections made by plaintiff's counsel appear to have merit. No cases involving the precise point of determining the question of whether the headlights were burning at the time of the collision, from an examination of the interior filament of a headlight bulb, have been cited by either counsel for the plaintiff or for the defendant.

The question of whether the headlights of the Chevrolet were burning at and prior to the time of the impact would be material and relevant to the question of whether the Chevrolet was readily visible to the Watkins truck driver Chastain when the Chevrolet was still a considerable distance away from the scene of the collision.

The subject matter of Flannagan's testimony, to the effect that an impact of 6 or 7 Gs would cause distortion of the filament of a burning automobile headlight is not within the ken of the average juror. It would appear, prima facie that such subject matter would be properly within the field of an expert's testimony. "The question of the qualification of a witness as an expert in the field concerning which his testimony is sought * * * rests in the first instance in the sound discretion of the trial court, and its decision in those

respects is not to be set aside in the absence of showing of an abuse of discretion." Yocum v. Kansas City Pub. Serv. Co., Mo., 349 S.W.2d 860, 1. c. 864.

As previously mentioned, since this case must be reversed as to defendant Watkins for the other reasons noted in this opinion, and since, on retrial the evidence will probably not be the same, in all respects, as given in the instant trial, we do not propose to further lengthen this opinion by analyzing and determining each and every point raised with reference to this subject matter of the chain of possession of the fender and headlights and the opinion of the expert on the question presented, nor the correctness of the court's rulings with reference to the objections made by plaintiff during the course of such testimony.

## ERROR IN CHANGING DEPOSITION TESTIMONY?

Plaintiff also alleges error on the part of the court in permitting counsel for the defendant to change the wording of a deposition of Mr. Grime and that part of the testimony which read:

"Q  In what direction was this truck from the northbound lanes of traffic on Highway 71?

"A  West.

"Q  Facing west?  "A  Yes, sir."

In a conference held out of the hearing of the jury, counsel for defendant Watkins stated:

"MR. BROWN: I would like to state for the court and record that this is the one correction in this deposition that should be made, and if I had time I would have had the reporter do it, but I did not have time.  The question I actually asked at page 12, after the first question was asked, 'In what direction was this truck from the northbound lanes of traffic on Highway 71?'  The answer was 'West', and my question was, 'Facing east', and she transcribed it 'Facing west'."

"THE COURT: You may, if it was your question.  We all know it was facing east, and I think Mr. Hale would stipulate to that change, but if he doesn't —that is up to him.

"MR. BROWN: Do you want to so stipulate?

"MR. HALE: No, Mr. Brown.  I have answered that before.

"MR. BROWN: Would I have the right to explain that at the time to the jury?

"THE COURT: Yes, you may.  When you read the question that was actually asked.  Read the question the way it was transcribed.

"MR. BROWN: I will."

Thereafter, and before the jury the following testimony was adduced:

"Q  In what direction was this truck from the northbound lanes of traffic on Highway 71?

"A  West.

"Q  Facing west?

"At this point Mr. Brown addressed the court as follows:

"With leave of court, my question actually was 'Facing east?', and the reporter transcribed it 'Facing west?'; therefore, my question would be, 'Facing east?', and the answer 'Yes, sir'.

"Q  Was the truck moving or stopped when you first saw it?  "A  It was stopped."

Supreme Court Rule 57.22 provides in part as follows:

" * * *  Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the rea-

sons given by the witness for making them; * * *."

In Loveland v. Rowland (Mo.) 361 S.W. 2d 685, 688, Judge Hyde wrote:

"The emphasized part of this rule clearly means that any changes shall be entered on the deposition by the officer before whom the deposition was taken and not by the witness, his lawyer or anyone else."

It was manifestly erroneous to permit counsel for defendant Watkins to so change the deposition of the witness Grime in the instant case.

## PREJUDICIAL ERROR IN RESTRICTING PLAINTIFF'S ARGUMENT?

Plaintiff makes a further point that "The trial court erred in not allowing plaintiff's counsel to comment in argument on the absence from trial of defendant Watkins' employee, Chastain, because he was driving defendant's truck at the time and knew many pertinent facts."

In defendant Watkins' separate answer to plaintiff's first amended petition, on which this case was tried, defendant Watkins specifically admitted paragraph 3 of that amended petition which read:

"3. At all times herein mentioned Thomas D. Chastain was acting in his capacity as an agent, servant and employee of the defendant Watkins Motor Lines, Inc."

All of the negligence pleaded by plaintiff against defendant Watkins pertained to the operation of the tractor and trailer rig while it was proceeding around Loop 29 headed in an easterly direction and was in the process of crossing Highway 71. Plaintiff's amended petition alleged: "8. The defendant Watkins Motor Lines, Inc., drove its tractor and trailer rig in a careless and negligent manner in one or more of the following particulars," then in four

subparagraphs alleged that the defendant Watkins failed to keep a proper lookout, to stop at the stop sign, "to yield the right of way to the northbound automobile which was driven by the deceased James Albert Judkins at the time in a northerly direction on Highway 71" and failed to observe the traffic control signs. Subparagraph 8 alleged "Defendant Watkins Motor Lines, Inc. was grossly and wantonly careless in each of the above specifications."

The evidence was that Chastain was the driver and sole occupant of the Watkins rig at the time of the collision. Chastain was not called to testify and no evidence was adduced to account for his absence or failure to testify.

The action of the court in forbidding plaintiff's counsel to comment in argument on defendant Watkins' failure to produce the driver took place out of the hearing of the jury, after the court had determined the instructions that would be given, including plaintiff's verdict directing Instruction No. 3 (M.A.I. 17.02), which read:

### "INSTRUCTION NO. 3

Your verdict must be for plaintiff if you believe:

First, defendant either:

Violated the stop sign or failed to yield the right-of-way, and,

Second, defendant's conduct in any one or more of the respects submitted in paragraph First was negligent, and,

Third, as direct result of such negligence plaintiff sustained damage." [1]

It is noted that no mention of the employment or agency of the driver was made in such instruction nor in any other instruction given, proposed or refused. It is quite likely that both counsel for plaintiff and the court believed that the agency and employment of Chastain were not in

1. This instruction is not set out as an approved model for use in this type of a case but merely to demonstrate its lack of reference to agency or employment.

the case because of defendant's admission of paragraph 3 of plaintiff's petition, supra.

After conference regarding instructions the following discussion took place out of the hearing of the jury:

"MR. HALE: We would like to bring to the court's attention the fact that I propose, in my argument, to comment upon the fact that the driver for Watkins Truck Lines was not brought to the courtroom and put on as a witness.

"MR. BROWN: We object to any such argument by plaintiff's counsel on the grounds there has been no showing in the evidence that the driver is employed at Watkins at the time of the suit and trial of this cause. There has been no showing that he is available to Watkins Motor Lines, and we feel it would be unfair and prejudicial to the defendant.

"THE COURT: Is he employed by Watkins Motor Lines?

"MR. BROWN: Now?

"THE COURT: At this time?

"MR. BROWN: No.

"THE COURT: How long has it been since he has been an employee of Watkins Motor Lines?

"MR. BROWN: The last of 1965 or early 1966. Let me say this. In truth and fact he has never been actually employed by Watkins. He was an employee of Ed Wright, who owned the tractor, as shown in the evidence, which tractor was leased to Watkins for the purpose of this load. He was an agent at the time of the accident. He is not an employee of Watkins at this time.

"THE COURT: The objection is sustained and counsel is instructed not to argue that point to the jury."

We first note that the statements of Mr. Brown that Chastain was not employed by Watkins at the time of trial nor since "The last of 1965 or early 1966" and that "he has never been actually employed by Watkins." were statements of counsel to the court and did not constitute evidence in the case.

However, there was some evidence in the case regarding Chastain's actual employment. Watkins' vice-president, John L. Horning, testified that he knew Chastain personally; that the vehicle involved in the collision consisted of an eight foot wide cab-over-diesel engine tractor weighing 14,850 lbs. and a 40 foot trailer weighing 17,270 lbs.; that this combination at the time of the collision was driven by Chastain for the purpose of hauling, for defendant Watkins, 38,950 pounds of meat (total load weight of rig and contents 71,-070 lbs.) from Sioux City to Miami, Florida. Horning further testified that this particular vehicle was one of twenty identical tractor-trailer units purchased in a fleet by Watkins; that "We had sold this unit to Mr. Wright who in turn leased it to us"; that Horning knew Chastain was the driver of the tractor on the evening of January 8, 1965; that Chastain was an employee of Mr. Ed Wright the man who owned the truck. On cross-examination Mr. Horning testified that he directed Mr. Chastain where to go to pick up his load, where to take it, " * * * Q And he was on that route at the time of this collision? A Yes, sir."

Under all the circumstances of this case including defendant's admission contained in the pleadings, the facts adduced in evidence and the pleaded negligence against defendant Watkins which pertained only to the driving of the tractor and trailer rig, the driver thereof, Chastain, would be a logical witness for defendant Watkins to call to testify in its behalf.

Defendant Watkins had made a solemn judicial admission in its answer to the effect that at the time of the collision at issue Chastain was acting in his capacity as an employee of defendant Watkins. Such ad-

mission relieved plaintiff of the duty of adducing proof of such issue. It should be construed to grant plaintiff's counsel all of the rights, in making his argument to the jury, to which plaintiff's counsel would have been entitled if Chastain's employment by defendant was an uncontroverted fact.

In a recent case, Duboise v. Railway Express Agency (Mo.) 409 S.W.2d 108, 113, this court said:

" 'The failure of an employer to call as witnesses or explain the absence of his employees who have knowledge of the facts in issue has often been held to justify an inference or presumption adverse to the party.' Annotation 5 A.L.R. 2d 893, 896. * * * "

and that,

" * * * more than twenty Missouri cases are noted in 68 A.L.R.2d l. c. 1075, that 'it is permissible for counsel in a civil case, in his argument to the jury, to comment on the failure or omission of the adverse party to produce or examine as a witness on his behalf an employee of such party who is apparently qualified to testify in regard to the matter or question in issue.' "

Further in the Duboise case, supra, this court said, l. c. 114:

"Or conversely when a defendant was denied the right to comment on a plaintiff's failure to call a doctor: 'It is not a question of sufficiency of the evidence. It is a question of a litigant having been denied the right of argument to a jury. There is no way to determine from the record the effect of this ruling on the verdict. It is clear that defendant was entitled to make the argument and have the jury consider same in determining the question of damages. The error was prejudicial, and the judgment should be reversed and the cause remanded.' McInnis v. St. Louis-Southern, Inc., 341 Mo. 677, 684, 108 S.W.2d 113, 116. By the same token the error in this case was manifestly prejudicial and the trial court

abused its discretion in not granting plaintiffs a new trial as to the respondent Railway Express Agency."

We conclude that the trial court erred prejudicially in denying plaintiff's counsel the right to comment on the fact that the driver for Watkins Motor Lines was not brought to the courtroom and put on as a witness. We rule as this court did in the Duboise case, supra, that the trial court abused its discretion in not granting plaintiff a new trial as to the defendant Watkins Motor Lines, Inc. because of such prejudicial error.

For the reasons indicated the judgment entered in favor of each of the defendants is reversed and this cause is remanded for a new trial against both defendants.

HENLEY, P. J., and STORCKMAN, J., concur.

SEILER, J., not sitting.