Janice (Honn) STORM,
Plaintiff-Respondent,

v.

FORD MOTOR COMPANY and
Broadway Motors, Inc.,
Defendants-Appellants.

No. KCD 26863.

Missouri Court of Appeals,
Kansas City District.

Aug. 4, 1975.

Motion for Rehearing and/or Transfer
Denied Sept. 2, 1975.

Application to Transfer Denied
Oct. 13, 1975.

Fred J. Wilkins, Shughart, Thomson & Kilroy, Kansas City, for defendant-appellant Ford Motor Co.

James H. Ottman, Shook, Hardy & Bacon, Kansas City, for defendant-appellant Broadway Motors, Inc.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

SHANGLER, Judge.

This claim arises from a collision between a tractor-trailer and an automobile alleged to have been defectively manufactured by the defendant Ford Motor Company and sold to plaintiff by the defendant Broadway Motors.

The plaintiff Janice Storm was operating her 1967 Ford Mustang easterly on Interstate 70 at about 70 miles per hour. As she approached Sweet Springs, Missouri, she moved her car into the left lane in order to pass a tractor-trailer. As she did so, she noticed that her vehicle had drifted to the right, and attempted to correct this position by turning the wheels to the left. At this point, so she testified, her Mustang suddenly fishtailed and started to swerve around the road. As she turned the steering wheel to the right and then to the left, the car responded to the direction but remained out of control and suddenly veered across the road and lodged its nose under the truck at an angle of about 45°. Engaged in this position, the Mustang was dragged down the highway for about 1000 feet.

The driver of the tractor-trailer heard a loud noise and then saw the Mustang on the median strip out of control. Another witness, driving behind the tractor-trailer, saw the Mustang catch the left shoulder of the highway. These witnesses both testified that the Mustang reeled across the highway from the left and nosed under the trailer, so that the right side of the car came into collision with the front of the left rear wheels of the truck. The highway patrolman found two skid marks created by the Mustang, measured at 1020 feet.

The plaintiff had purchased the Mustang as a new car although it had been a demonstrator for Broadway Motors and driven 80 miles in that use. Since the purchase in July of 1967, the plaintiff had driven the Mustang about 3100 miles, all without any steering difficulty. Other than for regular service, the Mustang had never required maintenance or repairs.

The plaintiff had judgment for personal injury and property damage on a theory of strict tort liability. It was the trial contention that the casualty occurred when the right rear wheel bearing gave way.

The appellants assign four points of error for reversal, among them that appellants were prejudiced by the exclusion from evidence of Exhibit 6 proffered by defendant Ford. That exhibit was a wheel bearing, asserted by Ford as a component of the right rear axle assembly of the Mustang in place at the time of the casualty, the mechanical part which the plaintiff alleged was defective and caused her injury. The court allowed the exhibit for purposes of

demonstration only, but not as real evidence on the theory that the wheel bearing had not been identified through an authentic chain of custody.

The petition of the plaintiff proceeded on a pleading of strict tort liability in that the Mustang was rendered dangerous because of a defect in the wheel bearing, and the proof was that the right rear wheel bearing gave way, causing the automobile to go out of control. Thus, the condition of that mechanical element of the right rear axle assembly became the focus of the proof.

The expert witness for the plaintiff, Cecil France, testified that the collision was caused when the right rear wheel bearing gave way, so that the wheel thus detached from the pinion assembly was no longer subject to steering control. Both France and the expert for Ford, Hugh Daley, agreed that if the right rear axle was laterally displaced during the forward operation of the Mustang, the wheel and axle would start wobbling. Daley added that the wobbling of the axle would be accentuated by the fishtailing which the plaintiff described and that the movement of the axle shaft would cause the wheel bearing to discolor and probably rupture.

It was the trial contention of the defendants that the wheel was not displaced until after the Mustang collided with the truck and was dragged sideways. They contend that the wheel bearing, offered as Exhibit 6, was palpably free of any distortion or discoloration, and therefore was persuasive evidence that the axle was not out of place before the Mustang lodged under the truck. They contend also that the bearing was sufficiently identified to allow the jury to decide whether the proffered exhibit was in fact in place in the Mustang at the time of the casualty, and that they were prejudiced by the refusal of the court.

Whether proffered Exhibit 6 was identified, prima facie, as the wheel bearing component of the right rear axle assembly of the Mustang on the date of the casualty rests on this evidence of custody: On the day of the collision, December 22, 1967, the car was towed from the scene to the Hall Motor Company in Sweet Springs, Missouri, where it was inspected several days later by Cecil France. France, an employee of Auto Damage Appraisers, had received this assignment from the Automobile Club Inter-Insurance Exchange, collision carrier for the plaintiff. France noticed that the right rear axle was out against the fender, concluded something was amiss, and received permission from the Auto Club to remove the rear axle and housing. France photographed the Mustang and observed as a Hall mechanic removed the axle, tire and wheel on December 27, 1967. France then took these parts to his Columbia office where he cleaned them, and then had them photographed. A short time later, France returned the parts to the Auto Club, and at their direction, marked the axle with his initials. The other parts were not marked. The parts were then kept by the Auto Club until late 1968.

On the motion of defendant Ford for production and inspection, the court ordered the plaintiff to produce all the parts of the Mustang, the subject of the pending action, still in her actual or constructive possession. On December 6, 1968, a clerk from the law firm representing Ford took possession of the right rear axle assembly and gave a signed receipt for "the following parts of the automobile which [plaintiff] owned and was operating on the date of the casualty of December 22, 1967: right rear axle assembly with bearing". Nine months later, on September 22, 1969, the parts were returned by Ford's counsel to Carl Crick, Auto Club claims manager, whose signed receipt acknowledged the return of the same parts as had been relinquished. These parts remained in the custody of the Auto Club until they were given over to counsel for plaintiff for the trial.

The contention of the plaintiff that the chain of custody of the wheel bearing does

not permit prima facie identification rests upon the inability of her expert, France, to identify proffered Exhibit 6 as the bearing taken from the damaged Mustang. Although he had inscribed his initials upon the axle, the bearing and other parts then on the axle were not identified with his mark. The plaintiff also points to the testimony of Carl Crick, Auto Club claims manager that although he signed the receipt which acknowledged that Ford had returned the same parts taken, Crick actually never personally examined them, the parts were wrapped when he received them from France. Finally, the plaintiff urges an inference that while the parts were in the custody of Ford, they were mailed to Dearborn for inspection. These factors, plaintiff contends, render the chain of custody incomplete and deprive the exhibit of evidentiary value.

 The admissibility of any evidence, whether circumstantial, testimonial or demonstrative—that is, proof which appeals directly to the senses of the trier of fact—depends on relevancy, materiality and whether by proper foundation the evidence has been identified and connected with the issue. Jones on Evidence, § 15.2 [Sixth Edition]. When demonstrative evidence is offered, an adequate foundation for admission requires authentication that the object offered is the object involved in the controversy and remains in a condition substantially unchanged. "A foundation of this sort will commonly entail testimonially tracing the chain of custody of the item with sufficient completeness to render it improbable that the original item has either been exchanged with another or has been contaminated or tampered with." McCormick on Evidence, p. 527–8 [2d ed. 1972]; State v. Lemon, 504 S.W.2d 676, 684[15, 16] (Mo.App.1973).

 The chain of custody doctrine as a principle of proof relates equally to civil and criminal proceedings. The criminal decisions of our state have postulated the rule that a chain of evidence is sufficiently traced where the circumstances show a "reasonable assurance that the [object] was the same and in the same condition." State v. Smith, 222 S.W. 455, 458[5] (Mo.1920); State v. Nolan, 499 S.W.2d 240, 251[10, 11] (Mo.App.1974). This test does not require an account for "[the] hand to hand custody of the evidence from the time it is obtained to the time it is admitted into evidence, nor does it need to be continually watched." State v. Day, 506 S.W.2d 497, 502[11] (Mo. App.1974).

 The rule in civil cases is no more elaborate. As in criminal cases, a complete chain of evidence must trace the possession of the object sought to be admitted. If one link in the chain is missing, the object cannot be received. Wehrkamp v. Watkins Motor Lines, Inc., 436 S.W.2d 698, 712[4] (Mo.1969); see, also, 29 Am.Jur.2d, Evidence, § 774 [cited in Wehrkamp]. A complete chain of custody, however, is not a requirement of a perfect chain of custody. Thus, in Connor v. Wabash R.R., 149 Mo. App. 675, 129 S.W. 777 (1910) [where the plaintiff attributed her failure to see the approaching train to a growth of weeds at the crossing] the defendant railroad caused the weeds to be cut a few days after the casualty. A number of them were gathered and tied by the county surveyor who was making measurements of the scene for the plaintiff. At the trial the surveyor testified that the weeds appeared to be those he had gathered, tied and tagged and that he recognized the handwriting on the identification card as his own. As against the contention that foundation for the evidence was not sufficient because it did not appear that the witness had retained custody of the evidence, the court determined that a prima facie identification had been made. In Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d 743 (1953), the decedent had committed suicide while under treatment at the defendant hospital. She had been found dead with a yellow and pink string around her neck. At the trial, four torn night-

gowns were offered in evidence by the plaintiff who testified they had been given him by a member of the hospital staff, and at the time—as well as at the trial—the identifying tags of the hospital were fastened to the garments. The defendants claimed that there were only two nightgowns, the yellow ones. Their witnesses did not see or know of the pink nightgowns, and the two nightgowns of which they knew were not in the torn condition they appeared at the trial. The court sustained the identification of the evidence and received them as exhibits. And, in *Bean v. Riddle*, 423 S.W.2d 709 (Mo.1968), the court contending with blood alcohol specimen concluded that admissibility did not depend upon the preclusion of every possibility of doubt as to the identity of the specimen. It was sufficient that the evidence showed custody of the specimen from the time of withdrawal until the analysis, thus reasonably assuring the reliability of the tests. The court determined that the discrepancy between the label notation made by the sheriff that Dr. Smith had drawn the blood, rather than Dr. Simpson as all the other evidence showed, was a matter for the jury.

■ It is the sense of these decisions that where an unbroken chain of custody is shown, the object will not be excluded merely because the evidence as to the succession of custody was conflicting or the identification less than positive.

The evidence before the trial court was of an unbroken chain of custody of the wheel bearing in this sequence:

From: Hall Motor Company which took the damaged Mustang in tow on the day of the casualty, December 22, 1967 and then on December 27, 1967 at the direction of the Auto Club, collision carrier for the plaintiff, removed the axle assembly and wheel bearing and transmitted them.

To: Cecil France to the Auto Club who photographed the parts, marked the axle, and within days delivered the parts.

To: The Auto Club, which retained custody of the parts until December 6, 1968, when pursuant to the court order for inspection the parts were transmitted

To: A law clerk for the defendant Ford Motor Company by a signed acknowledgment by the clerk that he had received the axle assembly and bearing, parts installed in the Mustang at the time of the casualty. Nine months later, on September 22, 1969, counsel for Ford Motor Company returned the parts

To: Carl Crick, claims manager for Auto Club, who by receipt acknowledged return of the same parts as had been relinquished. The Auto Club retained custody of the parts until they gave them over

To: Counsel for plaintiff for the trial commenced on June 11, 1973.

■ This concatenated sequence of custody shows a prima facie identification of the bearing which dispels the contention of the plaintiff that the inability of her expert, Fránce, to identify that part as taken from the damaged Mustang and that the receipt signed by Crick for the Auto Club that the parts returned by Ford were those relinquished under the court order, given without his inspection, as a matter of law excluded the bearing as an admissible exhibit. The self-contradiction between the acknowledgment of the receipt given by Crick and his testimony that despite the signature he never saw the parts raised a disputed issue for the jury. *Stallman v. Robinson, supra*, 260 S.W.2d l.c. 749[7, 8]. Other evidentiary discrepancies in the chain of custody—properly for the jury—also bear on the ultimate inference of the authenticity of Exhibit 6 as the wheel bearing taken from the damaged Mustang: the failure of expert France to identify the part; the retention by Ford of the parts for over nine months despite the order of the court that they were not to be kept more than thirty days; the fact that the receipt had

been drafted by counsel for defendant Ford and the intimation that the parts had been shipped out for further inspection while in the custody of Ford.

The exclusion of evidence will not be accounted reversible error in the absence of an abuse of discretion by the trial court. *Bine v. Sterling Drug, Inc.*, 422 S.W.2d 623, 631[8] (Mo.1968). Such an abuse appears. Accordingly, the cause is reversed and remanded.

All concur.