Patricia G. RINKER,
Plaintiff-Respondent,

v.

FORD MOTOR COMPANY,
Defendant-Appellant,

and

Bill Woods Ford, Inc., Defendant-Third-Party Plaintiff.

No. KCD 28550.

Missouri Court of Appeals,
Kansas City District.

May 1, 1978.

Motion for Rehearing and/or Transfer
Denied June 12, 1978.

Application to Transfer Denied
July 24, 1978.

---

658

John M. Kilroy, Don B. Roberson, W. James Foland, Kansas City, for defendant-appellant.

Larry L. McMullen, Kansas City, for Bill Woods Ford, Inc.

Joseph W. Amick, Kansas City, for plaintiff-respondent.

Before WELBORN, Special Judge, Presiding, PRITCHARD, J., and HIGGINS, Special Judge.

ROBERT R. WELBORN, Special Judge.

Action for damages for personal injury sustained in automobile collision. Driver of vehicle sued Ford Motor Company, manufacturer of auto, on alternative theories of strict liability and negligent failure to warn. Dealer-owner of vehicle, Bill Woods Ford, Inc., was sued on strict liability theory. Jury returned verdict for plaintiff against Ford for $100,000 actual and $460,000 punitive damages. Jury found for Woods on plaintiff's claim. Ford appeals.

Patricia G. Rinker, plaintiff, was interested in purchasing an automobile. On June 27, 1973, she went to Bill Woods Ford, Inc., a dealership in Clay County, Missouri. A salesman showed her three used Ford LTD's and Ms. Rinker took a test drive in each of them. The third vehicle which she drove was a 1969 LTD with a 429 V–8 motor.

This vehicle had originally been purchased from a Ford dealer in Mitchell, South Dakota, by Henry Mancini. It had been used as a demonstrator and had 13,000 to 14,000 miles on the odometer at the time of sale. Mancini traded it to Woods on June 18, 1973; it had been driven 62,422 miles.

Ms. Rinker had no difficulty with the auto until she was returning to the Woods place of business. As she was driving north on Antioch Road, approaching the Vivion Road intersection, she decided to check the vehicle's acceleration. She pressed the accelerator to the floor and its speed increased from about 20 to 40 miles per hour. She then slowed the auto and again depressed the accelerator fully. On this second occasion, when she removed her foot from the accelerator at about 40 miles per hour, the auto continued to accelerate. Ms. Rinker tried unsuccessfully to slow the vehicle with the brakes. She approached the Antioch-Vivion intersection at about 70 miles per hour. There was traffic in her lane of travel, stopped for a signal at the intersection. Ms. Rinker turned the auto to the left into the concrete median divider. The LTD became airborne and went into the intersection, striking another vehicle. Ms. Rinker sustained injuries which will be discussed below, for which she filed suit to recover damages from Ford and Woods.

At the trial plaintiff's evidence showed that the fast idle cam, a part of the carburetor assembly made of nylon, was found, after the accident, to have been broken. Plaintiff's witnesses testified that, when the accelerator was pushed to the floor, the broken cam rotated into a position where it jamed the fast idle lever into an open position, holding the primary throttle valves of the 4-barrel carburetor open.

A mechanical engineer testifying for plaintiff expressed the opinion that the design of the carburetor involved was inadequate because the section of the fast idle cam that connected the forward portion of the cam to the rear portion at the carburetor barrel was too small to withstand the loads imposed on the cam and because in the event of a break of the forward portion of the cam, there was no stop on the aft part to prevent its rotating into a position to lock the fast idle lever. He stated that the fast idle cam broke because of inadequate design.

A chemical engineer testified for plaintiff that in his opinion Zytel 101, a DuPont nylon used to form the fast idle cam, was a poor choice of material because it is degraded and loses its ductility when subjected to heat, moisture and air oxidation. Conditions under the hood of an auto can weaken a cam made of such material to the extent that stress from the choke lever can fracture the cam. He examined the cam here involved and found some discoloration and

"a conchoidal fracture with a small compression fracture at the top of the fracture, such as you would get if you were to hit the part with a hammer." The witness was of the opinion that other available plastic materials superior to nylon in strength could be used as a cam in a carburetor.

Ford offered evidence that the throttle valves were held open on the vehicle by non-standard, foreign parts added to the carburetor after manufacture.

Plaintiff's claim based on strict liability was submitted by separate instructions against Ford and Woods. Another instruction submitted a claim against Ford based upon negligent failure to warn. A punitive damages instruction submitted such claim against Ford in the event of a finding against that defendant on the negligent failure to warn theory. The jury returned a verdict in favor of plaintiff and against Ford for $100,000 actual and $460,000 punitive damages. The verdict was in favor of Woods.

In this court, appellant first contends that the trial court should have sustained its motion for judgment n. o. v. because the verdict of the jury was inconsistent in finding against Ford and in favor of Woods.

Instruction No. 2 submitted plaintiff's strict liability theory against Woods and No. 3 did likewise as to Ford. Both followed MAI 25.04. Instruction No. 4, following MAI 31.01, submitted the negligent failure to warn theory against Ford. Instruction No. 2 required the jury to find, among other things, that the 1969 Ford vehicle was "defective" as offered for sale and delivered to plaintiff by Woods. No. 3 required a finding that the vehicle was defective as manufactured by Ford. Instruction No. 4 required a finding that, among other things, the auto "had a fast idle cam that would break and was thereby dangerous to persons using it in the manner and for the purpose intended * · * *."

According to appellant's analysis of Instructions Nos. 2 and 3, the only matter submitted by those instructions and neither conceded nor in effect found in arriving at a verdict for plaintiff under Instruction No.

4 was that the vehicle was "defective." Appellant points out that shortly after the jury retired to deliberate, they sent the following communication to the court: "Jury request definition of the word 'defective' as it pertains to this specific case." The court responded: "Under the law I cannot answer this question." Ford argues that the jury did not find for plaintiff on the strict liability submissions because the jury was unable to reach a belief that the vehicle was "defective" and that, inasmuch as the duty to warn postulated in Instruction No. 4 arose only if the vehicle was defective, the verdict is inconsistent and cannot stand.

The courts of this state have not had occasion to deal at length with the question of inconsistency as affecting the validity of jury verdicts. Verdicts exonerating a servant but placing liability upon the master solely on the basis of respondeat superior have not been permitted to stand. *Devine v. Kroger Grocery & Baking Co.*, 349 Mo. 621, 162 S.W.2d 813, 816–817[1] (1942); *Lynch v. Hill*, 443 S.W.2d 812, 817–818[6, 7] (Mo.1969). In such cases there is contradiction between "two findings treating of the same essential matter * * *." 76 Am. Jur.2d Trial, § 1154, p. 123 (1975). Rules have arisen pertaining to findings on claims of a spouse for loss of consortium tried jointly with the other spouse's claim for personal injury. Thus, a verdict in favor of the latter and against the former who has presented undisputed evidence of "loss of 'consortium, assistance, society and care'" has been found inconsistent and the latter will not be permitted to stand. *Manley v. Horton*, 414 S.W.2d 254, 261[15, 16] (Mo. 1967); *Stroud v. Govreau*, 495 S.W.2d 682 (Mo.App.1973); *Barlow v. Thornhill*, 537 S.W.2d 412, 423–424[15] (Mo. banc 1976).

On the other hand, where several claims are joined for trial, consistency among the verdicts disposing of the several issues is not required. *Page v. Hamilton*, 329 S.W.2d 758, 764–767[10, 11], [12, 13] (Mo.1959). In that case the court stated (329 S.W.2d 767[12, 13]):

" * * * We believe the better rule to be that where separate causes of actions are joined under the permissive authority of section 509.460 and tried together, a general verdict will not be held to be fatally defective for inconsistency unless there is error in the pleading, proof or submission of the actions."

There is no legal inconsistency between a finding against Ford in this case on the negligent failure to warn theory and a lack of finding against Ford and Woods on the strict liability theory. They are separate and distinct theories of liability. What prompted the jury to act as it did in this case is at best a matter of speculation and conjecture. The jury's inquiry did indicate some difficulty with the term "defective" used only in the strict liability submissions. That inquiry affords no basis for presuming that the jury failed to follow the court's instructions. The presumption, of course, is that they did. Assuming, as do both the appellant and the respondent Rinker, that the verdict in favor of Rinker was based upon Instruction No. 4, the jury could correctly arrive at a verdict against Ford on the basis of that instruction, regardless of what conclusion the jury might have reached on the strict liability submissions. This assignment of error is without merit.

■ Appellant attacks the strict liability verdict directing instruction against Ford (No. 3). However, since Ford has taken the position that the jury found in its favor on the strict liability submission, there could have been no harm to Ford in that submission.

■ Appellant attacks Instruction No. 4 on several grounds. The instruction given was as follows:

· "[M.A.I. 31.01—submitted by plaintiff]

"Your verdict must be for plaintiff and against defendant Ford Motor Company if you believe:

"First, defendant Ford Motor Company manufactured the 1969 Ford automobile, and

"Second, the 1969 Ford automobile had a fast idle cam that would break and was thereby dangerous to persons using it in the manner and for the purpose intended, and

"Third, defendant Ford Motor Company knew or by using ordinary care could have known of the dangerous condition, and

"Fourth, the plaintiff did not know and by using ordinary care could not have known of the dangerous condition, and

"Fifth, defendant Ford Motor Company failed to warn its dealers or its customers of such dangerous condition, and

"Sixth, defendant Ford Motor Company was thereby negligent, and

"Seventh, while the 1969 Ford automobile was being used in the manner and for the purpose intended, plaintiff was damaged as a direct result of such dangerous condition."

Ford first contends that the instruction did not properly hypothesize the defect alleged, as required by MAI 31.01 in that the allegation of defect stated did not present to the jury the ultimate fact issue to be decided but instead imposed absolute liability on Ford. This attack is directed at the language in the second paragraph of the instruction: " * * * the 1969 Ford automobile had a fast idle cam that would break * * *."

Appellant argues that Rinker's theory of liability was premised upon two assumptions: 1. That the fast idle cam was inadequate because it was subject to breakage. 2. That if the cam broke, it could, because of defects in the design of the cam and adjacent component parts in the carburetor, wedge against the fast idle lever and jam open the fast idle lever of the carburetor. Appellant argues that the instruction submitted, at best, only the first portion of the plaintiff's facts relied upon by plaintiff to support her claim and totally ignored the essential element of faulty design.

A basic objective behind the adoption of MAI was to eliminate from jury instructions required findings by the jury "of detailed evidentiary facts." Rule 70.01. Not unexpectedly there is no MAI precisely applicable to this case. Plaintiff was required to modify MAI 31.01, keeping in mind the

guide in Rule 70.01(e) that the modification "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." MAI 31.01 calls for the defect involved to be described and gives as an example "a cracked left front wheel." The language employed here is wholly consistent with the language of 31.01 insofar as the defect is concerned. It described the defect which, according to plaintiff, was at the base of the condition which made the vehicle dangerous. The danger arose because of a combination of surrounding factors, but they were set in motion only upon the breakage of the cam. There was no necessity for plaintiff to require findings on those surrounding factors.

■ Appellant also contends that, inasmuch as the cam on the LTD did break, the submission that the cam *would* break amounted to the direction of a verdict against Ford. Appellant argues that the instruction should have postulated either the probability of injury to a certain class of persons or the potentiality of the product to be dangerous. The word "would" adequately submitted the issue in this case. Among the uses of the word, recognized by Webster's Third New International Dictionary (1961), is "an auxiliary function to express disposition or inclination  *  *  *." The instruction adequately directed the jury's attention to the issue of the breakability of the cam and the attendant potential for danger. The case of *Erny v. Revlon, Incorporated*, 459 S.W.2d 261 (Mo.1970), relied upon by appellant, involved a hair coloring product which contained an ingredient harmful to a small percentage of people using the product. In modifying what is now 30.01, plaintiff there described the defect as follows: "The hair-coloring product contained an ingredient known as para-phenylenediamine dye which *could* cause allergic and systemic damage and was thereby dangerous to some of the persons using it" etc. 459 S.W.2d 265. (Emphasis supplied.) In that case, the instruction went on to identify the class of persons likely to be affected, but in this case there was no reason to do so inasmuch as the danger was not limited to a peculiarly susceptible class of persons.

In *Krug v. Sterling Drug Co., Inc.*, 416 S.W.2d 143 (Mo.1967), the product involved was dangerous to some persons using it and the instruction was so limited.

In *Reckert v. Roco Petroleum Corporation*, 411 S.W.2d 199 (Mo.1966), the court suggested that the instruction submitting a question of furnishing a defective service station hoist submit the defect in terms of "likely to" puncture certain gasoline tanks. The submission in this case was not inconsistent with or contrary to the suggested form of instruction in *Reckert*.

Appellant's next objection to this instruction is based essentially upon the objections just discussed. Ford contends that inasmuch as the postulate of a dangerous condition in paragraph 2 "a fast idle cam that would break" was an absolute, the requirement of paragraph 3 that Ford have known of the "dangerous condition" meant that Ford must have known that either all such cams or the cam in the particular vehicle would break. Admittedly, there is no such evidence in this case. However, in view of the conclusion previously reached, that the language of paragraph 2 did not submit an absolute, this objection is without merit. Again, appellant's reliance on *Erny v. Revlon, Inc.* and *Krug v. Sterling Drug Co.*, supra, as well as *Stahlheber v. American Cyanamid Company*, 451 S.W.2d 48 (Mo. 1970), is misplaced because of the nature of the products involved in those cases. The instruction here follows MAI 31.01 precisely as to paragraph 3 and no modification was required.

Appellant next attacks the instruction for its failure to hypothesize Woods's lack of knowledge of the dangerous condition, a necessary element of plaintiff's cause of action, asserts Ford.

■ Ford offers no authority which supports the proposition that lack of knowledge on the part of the defendant manufacturer's vendee is an element of plaintiff's cause of action in a case such as this. Cases do support the proposition that failure to

comply with the duty to warn may not be the proximate cause of an injury to a person who knows of the dangerous condition. *Patrick v. Perfect Parts Company,* 515 S.W.2d 554 (Mo. banc 1974). In *Krug v. Sterling Drug Company,* supra, plaintiff's instruction hypothesized that neither she nor her doctor knew of the dangerous potentialities of the drug there involved. 416 S.W.2d at 153. That aspect of the instruction was not in question in the case.

■ In this case the instruction followed MAI 31.01 and appellant has not offered any authority which would require modification of the instruction along the lines contended by appellant.

Upon consideration of all objections by appellant to Instruction No. 4, no reversible error in the giving of such instruction has been found.

■ Appellant next contends that the trial court erred in admitting into evidence the carburetor removed from the Ford LTD, plaintiff's Exhibit No. 33, over appellant's objection that the exhibit had not been shown to have been in substantially the same condition when offered in evidence as it was at the time of the collision.

Exhibit No. 33 was admitted on the basis of the testimony of plaintiff's witness William Mathews. Mathews saw the damaged auto for the first time on October 24, 1973, at the Woods lot. The vehicle had been towed to the city impoundment following the accident and taken to the Woods lot the next day. On July 16, 1973, Officer Eber, then a member of the Kansas City Police Department, had examined the vehicle on the Woods lot and taken a series of photographs, including some of the motor which showed the condition of the carburetor. Those photographs were introduced in evidence. According to Mathews, the photographs of the carburetor showed it as he saw it when he first saw the car. Mathews supervised removal of the vehicle from the Woods lot to a shed at an auto salvage company on East 40 Highway. Mathews, accompanied by Eber, viewed the auto on February 15, 1974, at the salvage company lot. According to Mathews the vehicle was in essentially the same condition as when he first saw it on October 24, 1973.

On April 1, 1974, Mathews, accompanied by a Woods mechanic, again saw the auto at the salvage yard and the mechanic removed the carburetor and replaced it.

On July 12, 1974, the carburetor was again removed and given to Mathews. He kept it in his custody, except for limited periods of time, until the trial.

He testified that the carburetor as produced at the trial was in the same condition as shown by the Eber photographs except for the fact that the accelerator linkage appeared to have been bent more and some dirt and particles had been cleaned off the fast idle cam.

When the carburetor was offered in evidence, Ford counsel objected that the evidence failed to show "a proper foundation in continuity of possession" and that it had not been shown to have been in the same condition as at the time immediately after the accident.

On the basis of the evidence before the court at the time of the offer of the exhibit and the objection made, the trial court cannot be convicted of error for overruling the Ford objection. The evidence then before the court showed that the carburetor came from the LTD and that it was in substantially the same condition as it appeared shortly after the collision as evidenced by the Eber photographs. The evidence thus provided a "reasonable assurance that the [object] was the same and in the same condition." *State v. Smith,* 222 S.W. 455, 458[5] (Mo.1920), quoted in *Storm v. Ford Motor Company,* 526 S.W.2d 875, 878[3] (Mo.App.1975).

Appellant's attack on the admissibility of the carburetor is premised largely upon the subsequent testimony of Eber, a witness for Ford. According to Eber, he took the photographs relied upon by Mathews and then checked the carburetor. He acknowledged that one photograph showed the broken cam although he did not notice that fact in his inspection of the carburetor. He found

the linkage rod connecting the accelerator pedal to the carburetor jammed against the fire wall of the auto, holding the throttle open. Eber moved the motor forward, releasing the tension on the linkage rod and all carburetor linkages moved freely. According to Eber, he tested all of the carburetor linkages and they operated properly. He then disassembled the linkages to check for any binding and left the linkages disassembled.

The difficulty with predicating error on the part of the trial court on the basis of Eber's testimony is that nothing was presented to the trial court calling for a ruling as a result of such testimony. In Ford's brief, it states that, " * * * following uncontradicted testimony that the carburetor was not in substantially the same condition at the trial as it was immediately following the accident, the Court would not reconsider its ruling or limit the purpose for which Exhibit No. 33 could be used in further proceedings (Tr. 802–858, 858–968, 969–1001, 1002–1005)." The page references are to the "uncontradicted testimony," not to any request for reconsideration by the court of its ruling on the admissibility of the exhibit, or for a limitation on the use of the exhibit.

A prima facie case for admissibility having been made when the exhibit was offered, the trial court is not to be found to have erred on the basis of later unspoken objections or requests. Eber's testimony created an issue for the jury as to the authenticity of the exhibit (*Bean v. Riddle*, 423 S.W.2d 709, 718[2, 3] (Mo.1968)), but it did not render erroneous the trial court's ruling on Ford's objection to the admission of the exhibit in evidence.

Appellant's next assignment of error is based on the trial court's overruling of objections to the placing in evidence by plaintiff of a summary of and excerpt from a report from Ford Motor Company to the United States Department of Transportation, dated April 9, 1974. This report was in the form of a letter (Ex. No. 160) from J. C. Eckhold, Director of Automotive Safety for Ford to Andrew G. Detrick, Acting Director of the Office of Defects Investigation, National Highway Traffic Safety Administration. The report was in response to a demand of that agency under the Motor Vehicle Safety Act, 15 U.S.C. § 1391 et seq. Attached as an exhibit to the report was a list of the names and addresses of owners of Ford-made vehicles of whom Ford was aware who had reported jamming of the throttle on 4300–4V Carburetors which might have been attributable to fast idle cam breakage (Ex. No. 92).

Over Ford's objection based primarily on the hearsay rule, the trial court permitted plaintiff's counsel to read a summary of the material in Exhibit No. 92 to the effect that between December 24, 1968 and June 27, 1973, there were 29 reports to Ford of 4300–4V carburetor fast idle cam breakage jamming throttles. The carburetors were equipped with a "G" fast idle cam. (The carburetor in this case was so equipped.)

The trial court ruled that such evidence was admissible for the purpose of showing knowledge on the part of Ford of the allegedly defective part.

In this court, appellant repeats its hearsay objection, but the objection is without merit. Evidence that such reports had been received by Ford was admissible on the issue of knowledge and such evidence for that purpose is not precluded by the hearsay rule. "These questions and answers were improper as hearsay if offered only to prove the fact that the sealed area was slick. But aside from the *fact* of slickness there was the issue of defendant's *knowledge* of slickness. Evidence of *complaints* of slickness made to defendant was relevant to the material issue of defendant's knowledge. As said in *Miller v. Brunson Const. Co.*, Mo., 250 S.W.2d 958[9]: " 'Where, regardless of the truth or the falsity of a statement, the fact that it has been made is relevant, the hearsay rule does not apply, but the statement may be shown. Evidence as to the making of such statement is not secondary but primary, for the statement itself may constitute a fact in issue, or be circumstantially relevant as to the existence of such a fact.' " *Vinyard v. Vinyard Fu-*

*neral Home, Inc.,* 435 S.W.2d 392, 396[7] (Mo.App.1968).

■■ Appellant also complains that in final argument plaintiff's counsel used the evidence beyond the scope of the purpose for which it was admitted. No objection on that basis was made and no request for a limiting instruction was made. No error arises in this regard.

Appellant also assigns error in the admission of a paragraph from the letter of Eckhold, dated April 9, 1974, Ex. No. 160. The court had sustained objection to the use of the letter. Ford's objection was founded on the theory that the letter was the involuntary statement of Ford, under compulsion of law. However, in the course of the examination of Ford's witness, Raymond Cedar, a liaison engineer employed by Ford, a portion of the letter was introduced in the following circumstances:

On direct examination of Cedar, he answered in the negative as to whether there was any impact force that ever touches that cam in the operation of the carburetor that will cause it to break.

An interrogatory had been posed to Ford, as follows:

"With respect to the letter described in interrogatory 2 (Ex. No. 160), please state and describe the sources of information contained therein."

Ford's answer was:

"The source of information was Ray Cedar, Office of the General Counsel and Customer Service Division."

In cross-examining Cedar, counsel for plaintiff asked him whether or not he had told Eckhold, the signer of the letter for Ford, that an examination of all the data now available suggests that a limited quantity of [G] "fast idle cams were subject to cam breakage because of questionable cam quality in combination with impact loads imparted on the cam through the choke linkage as a result of engine backfire"?

Cedar denied that he had made such a statement. Plaintiff's counsel offered the exhibit in evidence for purpose of impeachment and the witness was asked to read from it the portion which contained the statement incorporated in the question. In response to further interrogation, Cedar indicated disagreement with the interrogatory response naming him as the *source* of the information.

In this court appellant contends that the court erred in admitting the statement for impeachment because it in fact did not impeach the witness. This argument is premised on the idea that the response to the interrogatory naming the *source* of the information in the report named three sources: Cedar, the Office of General Counsel and the Customer Service Division.

■■ The trial court is not to be convicted of error on its ruling. Appellant prepared the interrogatory answer before the court, using the singular "source," not the plural, in its answer. It may have been, as appellant's reply brief argues, a "grammatical error" but if it led the trial court astray, appellant must bear the consequences of the error.

■■ In any event, there is a broader reason for concluding that the court did not err. Appellant's objection throughout the trial to the use of the report (Ex. No. 160) and the accompanying exhibits (Ex. No. 92) was premised upon the fact that they were reports required by law. In support of that position in this court, appellant cites the case of *Vockie v. General Motors Corp.,* 66 F.R.D. 57 (E.D.Pa.1975), affirmed without opinion 523 F.2d 1052 (3rd Cir. 1975).

In that case the trial court excluded from evidence recall notices made under the National Traffic and Motor Vehicle Safety Act. 15 USC 1391 et seq. In overruling the motion for new trial, the court rejected a claim of error based on such ruling. It reasoned that the recall notice was not a voluntary admission. It also found that manufacturer could be reluctant to disclose defects if the statements were "admissible on a wholesale basis." (66 F.R.D. 61)

The Eighth Circuit Court of Appeals was confronted with a similar question in *Farner v. Paccar, Inc.,* 562 F.2d 518 (8th Cir.

1977), and it declined to follow the *Vockie* case. In its opinion the court said (562 F.2d at 526–527):

"We turn now to Paccar's contention that the Stephens' memoranda and the recall letter should have been excluded because of the hearsay rule. Ordinarily these documents would be admissions falling outside of the hearsay rule as prior statements by a party opponent or its employee offered against that party at trial. However, Paccar contends that these documents should not be considered admissions since the recall campaign, with which they were concerned, was initiated under the compulsion of the National Traffic and Motor Vehicle Safety Act.

Although the principles governing admissions by a party-opponent do not exclude admissions made under a duty imposed by law, such admissions may, nonetheless, be excluded where the statute imposing the duty expressly makes the communication confidential or where such privilege is necessarily implied in order to further public policy objectives. See 4 Wigmore, Evidence § 1050 (Chadbourn rev. 1972). The National Traffic and Motor Vehicle Safety Act imposes no express confidentiality upon recall communications between manufacturers and purchasers. Paccar argues, however, that such a privilege should be implied since the admission of recall evidence might deter manufacturers from disclosing potential safety hazards which they discover. See *Vockie v. General Motors Corporation, Chevrolet Div.,* 66 F.R.D. 57, 61 (E.D.Pa.), aff'd, 523 F.2d 1052 (3rd Cir. 1975).

"We decline to follow the *Vockie* case. In *Robbins v. Farmers Union Grain Terminal Ass'n,* 552 F.2d 788 (8th Cir. 1977), this Court held that the exclusionary rule governing subsequent remedial measures is inapplicable in a strict liability case because it serves no deterrent function. The reason for this conclusion is expressed by the South Dakota Supreme Court:

" 'A products liability case looks to a defect in the product rather than any culpable act by the manufacturer. In an age of

mass production it is not reasonable to assume that manufacturers would forego improvements in a product and subject themselves to mass liability for a defect just because evidence of·an improvement is admissible in a pre-improvement liability case. The pure economics of the situation dictate otherwise.' *Shaffer v. Honeywell, Inc.,* supra at 257 n. 7, quoted in *Robbins v. Farmers Union Grain Terminal Ass'n,* supra at 793.

"We believe that this reasoning is equally applicable here. Just as it is not reasonable to assume that manufacturers will forego improvements in products in order to avoid admission of the evidence of the improvements against them, it is not reasonable to assume that the manufacturers will risk wholesale violation of the National Traffic and Motor Vehicle Safety Act and liability for subsequent injuries caused by defects known by them to exist in order to avoid the possible use of recall evidence as an admission against them. We find no error in the admission of these documents on this ground."

The *Farner* case did not involve Missouri law but appears consistent with the law of this state on related issues. Thus, Missouri recognizes that a statement may be an admission, even if claimed to have been made under compulsion. *Ogle v. Todd,* 514 S.W.2d 38, 41[4] (Mo.App.1974). No provision of the federal law gives a protected status to communications required by it.

Thus, the trial court here could have properly admitted the report without regard for the impeachment issue. In such situation, there was no error on the part of the trial court. *Franklin v. Friedrich,* 470 S.W.2d 474, 476[1, 2] (Mo.1971).

Appellant contends that the verdict for plaintiff is so excessive as to indicate bias, passion and prejudice on the part of the jury, affecting the trial so that the verdict must be set aside and a new trial granted as to all issues.

Plaintiff, 37 years old at the time of the trial, sustained a brain concussion and was unconscious for a period of time after the

collision. She sustained bruises, lacerations and abrasions over her entire body. Fifty sutures were required to close the lacerations. She was left with permanent scars on her face, head, inside her mouth and on both knees. Her right ankle was fractured into the ankle joint. The ankle could not be placed in a cast promptly because skin had been torn off the ankle area. She wore a cast for six weeks. She received multiple fragmented fractures of nasal and underlying facial bones. A nerve in her face was permanently damaged. Her face is permanently disfigured as a result of injuries to her nose and face. She continued to have pain and weakness in the ankle at the time of trial.

Plaintiff was hospitalized for 15 days. Her medical and hospital bills were $2,948.60. There was evidence that, if she elected plastic surgery to correct her scars, her future medical expenses would be around $1,500. She lost seven weeks' wages at the rate of $765 per month.

Appellant charges that an award of $100,000 actual damages in this case was so grossly excessive as to indicate bias, passion and prejudice on the part of the jury.

■ There is no need to dwell upon appellant's first premise that the verdict was grossly excessive. Appellant's position requires it to show occurrences at the trial that caused the jury to ignore the evidence and the court's instructions. *Wolfe v. Harms,* 413 S.W.2d 204, 217[25–27] (Mo. 1967); *Skadal v. Brown,* 351 S.W.2d 684, 689–690[12–14] (Mo.1961). To sustain the burden which it has undertaken, Ford points to numerous matters involving the admission of evidence and argument. It points first to evidence of change in design which plaintiff adduced over objection. As noted in the *Farner* case, supra, the rule relied upon by appellant is of doubtful application in product liability cases.

Appellant points to a volunteer statement of plaintiff's plastics expert: " * * * I have found a strong urge to take part in some of the product liability cases, where I feel the consuming public have been victims, in these cases." Ford's counsel's ob-

jection was promptly sustained and the jury instructed to disregard the remark. Counsel for plaintiff, in closing argument, referred to "victimizing" of the consumer. No objection was made to the argument. The volunteered remark of the witness which the jury was instructed to disregard and the unobjected to remark in argument could hardly have produced the verdict in this case.

■ Appellant returns to the admission of Exhibits Nos. 92 and 160 in arguing this point. Since their admissibility has been sustained, argument based upon those matters is unconvincing. Appellant also complains of admission of two carburetors used for demonstration purposes. This was a matter within the court's discretion and no abuse has been demonstrated. *Wilcox v. St. Louis-Southwestern Railroad Company,* 418 S.W.2d 15, 18–19[1] (Mo.1967).

■ Appellant points to the court's ruling, precluding its obtaining testimony from its witness Eber about his experience in accelerating an auto to 70 miles per hour and braking it simultaneously. As Ford's attorney pointed out at the time the objection was sustained, Ford already had the benefit of testimony by another of its witnesses that a "properly braked" auto could be stopped even if the throttle was stuck wide open. Appellant's counsel made no offer of proof as to what Eber would say. This is not the type of matter which would support a finding that the verdict was the result of bias, etc.

Appellant has demonstrated no trial incident to which the verdict might be attributed. In the only case cited by appellant in which an appellate court awarded a new trial on the basis here urged, *Grodsky v. Consolidated Bag Co.,* 324 Mo. 1067, 26 S.W.2d 618 (1930), a $1,000 verdict in favor of a plaintiff who had sustained injuries and had medical expenses of some $839 was held grossly inadequate. The court in granting relief pointed to cross-examination of plaintiff and some of her witnesses that certain facts such as "her father's ownership of an expensive car, the nature of his

business, and her own race and foreign birth, were suggested and stressed in a manner more likely to create prejudice against plaintiff than to serve the legitimate purposes of cross-examination." No similarly prejudicial occurrences have been shown in this case. The only other case in which it appears that relief was granted on the grounds here urged was that of *Murphy v. Graves,* 294 S.W.2d 29 (Mo.1956), where misconduct on the part of two jurors was shown. Nothing comparable appears in this case. This assignment of error is without merit.

▮ Appellant contends that the damage instruction in the form of MAI 4.01 should have been modified to assure that the jury did not award plaintiff damages under both of plaintiff's verdict-directing instructions and thereby subject Ford to double recovery.

Appellant's argument on this point is in the face of its position on its first point in which it conceded that the verdict against Ford was on only one ground of liability—negligent failure to warn. At any event, the damage instruction directed the jury to award plaintiff damages for the "occurrence mentioned in the evidence." There was a single "occurrence," the collision which resulted in plaintiff's injuries. There is no reason to assume that the jury disregarded the instruction. Appellant offers no authority which requires modification of MAI 4.01 when alternative theories of liability are submitted.

▮ Appellant next contends that the court erred in instructing the jury on the issue of punitive damages because there was no probative evidence to support the submission of that issue. Appellant's point states further than an award of punitive damages "is a novel matter in a product liability case and raises serious issues of public policy."

In arguing the inadequacy of plaintiff's evidence on this issue, appellant accepts the standard of conduct presented by MAI 10.02 as the basis for an award of punitive damages in this case, i. e., defendant's conduct must have "showed complete indifference to or conscious disregard for the safety of others * * *." The problem here presented is whether or not the evidence viewed in the light most favorable to plaintiff would admit of a finding by the jury that appellant's conduct partook of this nature.

The evidence would have permitted the jury to find that Ford's Director of Automotive Safety knew that a limited number of 1968 and 1969 Ford vehicles were equipped with fast idle cams subject to breakage; that a broken fast idle cam could cause the throttle to jam open, hurtling the vehicle forward at a high rate of speed with no effective method of promptly stopping the car; that prior to Ms. Rinker's accident, over a period of four years, 29 reports of incidents involving broken fast idle cams had been received by Ford; that Ford took no steps to warn its dealers or customers of this problem.

Ford argues that, at the most, the evidence presented a jury question of negligence, but that there was no evidence of conduct on its part which reached the "aggravated character indispensable to an award of punitive damages."

The language of cases in the appellate courts of this state in which punitive damages have been allowed or refused is not particularly helpful in a case such as this. The important factor is the conduct which was found to warrant the imposition of punitive damages. Most nearly approaching the nature of the conduct of appellant here among cases in the state cited by either party is *Reel v. Consolidated Inv. Co.,* 236 S.W. 43 (Mo.1921). In that case, city inspectors had notified the engineer for the owner of a building that strands of wire were broken in an elevator hoisting cable and that the cable should be renewed in order to put the elevator in a safe condition. For six weeks nothing was done and at that time, the cable broke, the elevator fell and plaintiff sustained injury. In holding the evidence sufficient to authorize an award of punitive damages, the court stated (236 S.W. at 46):

One permissible view of the evidence is that at the time of the inspection on March 4th and subsequently the cables of the elevator were so worn and broken that they were likely to give way at any instant while in use; that Reel not only knew the physical condition of the cables, but he also knew and appreciated the imminent danger necessarily incident to their further use; and that his failure to renew them during a period of six weeks was not, and under the circumstances could not have been, the result of mere inadvertence, but of an utter indifference to the rights of those whose lives and limbs were thereby daily and hourly imperiled, equivalent to intentional wrongdoing."

As appellant points out, the judgment in that case was reversed because of error in the punitive damages instruction which assumed that defendant knew of the danger if the cables were not renewed. 236 S.W. 47[7]. However, the case is significant for its recognition of the nature of conduct which may be found to amount to conscious disregard of the safety of others.

In this case, the jury could undoubtedly have found that the breaking of a cam and the jamming of the accelerator causing the vehicle to travel at a high rate of speed without an effective means of control was a threat to the safety of not only the occupant of the vehicle but also to the occupants of other vehicles and pedestrians in the vicinity. The jury had the right to weigh Ford's inactivity against the hazard presented and could well conclude that Ford consciously or knowingly elected to disregard what it well knew to be a genuine potential for danger.

Appellant advances the argument that punitive damages are "inappropriate" in a products liability case such as this. As appellant suggests, no case in this state relied upon by either party has approved of punitive damages in a products liability case. However, given the purpose of punitive damages to punish a defendant for an aggravated act of misconduct and to deter similar conduct in the future by the defendant and others, there is no fundamental reason for excluding products liability cases from the cases in which punitive damages may be recovered. One writer suggests that punitive damages are particularly appropriate in such cases. Owen, Punitive Damages in Products Liability Litigation, 74 Mich.Law Rev. 1258, 1262–1299.

Appellant's primary reliance on this contention is upon *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967). That case involved a drug produced by defendant to reduce blood cholesterol level which turned out to have serious side effects, including causing cataracts. Punitive damages were sought based upon the claim that the defendant had deceived the Food and Drug Administration, the medical profession and consumers regarding the safety of the drug. A jury awarded the plaintiff $17,500 actual damages and $100,000 punitive damages. The award of punitive damages was reversed in the Court of Appeals on a 2 to 1 vote.

Judge Friendly, the author of the majority opinion, treated at considerable length questions which he felt were presented by allowing punitive damages in such a case. The court noted that the case "was the first to be tried of some 75 similar cases now pending in the District Court for the Southern District of New York. Several hundred actions have been filed elsewhere, * *." 378 F.2d at 834. Judge Friendly expressed the "gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill." 378 F.2d at 839. He questioned whether or not allowance of punitive damages in such a case would provide a greater deterrent than that found in the federal food and drug requirement. He also noted the possibility that "a sufficiently egregious error as to one product can end the business life of a concern that has wrought much good in the past and might otherwise have continued to do so in the future, with many innocent stockholders suffering extinction of their investments for a single management sin." 378 F.2d at 841.

However, despite these concerns, Judge Friendly acknowledged that in that diversity action, he could not predict that the New York courts would adopt a rule disallowing punitive damages in such a case and he decided the case on the grounds that plaintiff's evidence had not shown that the "management" of the defendant had authorized, participated in or ratified the conduct relied upon as giving rise to punitive damages. As pointed out, New York adheres to the "complicity rule," holding the corporate master liable for punitive damages "only when superior officers either order, participate in, or ratify outrageous conduct." 378 F.2d at 842[6].

Missouri does not follow the "complicity rule." Action of a nature which gives rise to such liability by a corporate agent acting within the scope of his authority is all that is required to impose liability for punitive damages on a corporate employer. *Tietjens v. General Motors Corp.,* 418 S.W.2d 75, 88[12–14] (Mo.1967).

The conduct of the same defendant and involving the same product as in *Roginsky* was held to support an award for punitive damages in *Toole v. Richardson-Merrell, Inc.,* 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967). The jury awarded plaintiff $175,000 actual and $500,000 punitive damages. The punitive damages award was reduced by remittitur to $250,000 and that award was upheld on appeal. The court concluded that the evidence showed the malice required to support an award of punitive damages based upon a showing that the "defendant's wrongful conduct was wilful, intentional, and done in reckless disregard of its possible results." The California court disagreed with Judge Friendly's conclusion that management had not participated in the wrongful conduct. 60 Cal.Rptr. 398, 416–417 N. 3.

In the cases of *Pease v. Beech Aircraft Corporation,* 38 Cal.App.3d 450, 113 Cal. Rptr. 416 (1974), and *Searle v. Superior Court,* 49 Cal.App.3d 22, 122 Cal.Rptr. 218 (1975), the court recognized that punitive damages might be recovered in a products liability case. In *Pease,* an award of such damages was set aside for error in instruc-tions. In *Searle,* pleading allegations were held insufficient to support the issue.

An award of punitive damages for injuries arising out of a defective television receiving set was upheld in *Gillham v. The Admiral Corporation,* 523 F.2d 102 (6th Cir. 1975). As pointed out by appellant the conduct of the defendant in that case was much more aggravated than that involved in this case. The manufacturer was aware of the defect when it began producing the set and took no remedial action despite numerous reports that the defect had caused fires.

Appellant's authorities and the argument based thereon are not persuasive that this court should, as a matter of public policy, refuse to permit punitive damages in a case such as this. The problems suggested by appellant will be dealt with as they arise. Means are available to both trial and appellate courts of the state for the control of excessive award of punitive damages. See *Beggs v. Universal C.I.T. Credit Corporation,* 409 S.W.2d 719, 724–725[8–13] (Mo. 1966). No such relief was sought in this case. (No opinion is expressed as to the amount of the judgment here.)

Appellant's final point is that the cumulative effect of the trial court's errors would require a new trial, even if considered separately such relief might appear to be inappropriate. Inasmuch as appellant's claims of error on the part of the trial court have not been accepted here, this claim need not be pursued.

Judgment affirmed.

All concur.