STATE of Missouri, Respondent,

v.

Ron A. PRICE, Appellant.

No. WD 36749.

Missouri Court of Appeals,
Western District.

April 7, 1987.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
June 2, 1987.

Application to Transfer Denied
July 14, 1987.

288

Robert Beaird, Howard C. Hoyt, Quinn, Peebles, Beaird & Cardarella, Kansas City, for appellant.

William L. Webster, Atty. Gen., Kevin B. Behrndt, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P.J., and DIXON and LOWENSTEIN, JJ.

SHANGLER, Presiding Judge.

The defendant Price was convicted by a jury on two counts of the sale of phencyclidine, a Schedule II Controlled Substance. The defendant was sentenced to a term of seven years imprisonment on each count, imposed to run concurrently. The defendant does not challenge the sufficiency of the evidence to convict, but argues that the prosecution failed to establish by a proper chain of custody that the substance allegedly sold by the defendant was identical with the substance tested and presented as the evidence to convict. The defendant also challenges the qualifications of the crime laboratory chemist to give opinion as to the analysis of the substance.

The prosecution presented evidence that on August 15, 1983, undercover officer Harris in company with detective Irvin and an informant came to an address and was introduced to the defendant Price by the informant. They entered the home, officer Harris asked for $15 worth of phencyclidine, and the defendant returned with a foil envelope which contained a yellow powder. The payment and money exchange were made, and the officers returned to the drug unit. They weighed the yellow powder and tested the content with a cobalt reagent. The officers then placed the substance into an evidence envelope, which Harris and Irvin initialed, and then sealed. The envelope was placed in the drug unit vault to be forwarded to the regional crime laboratory. The envelope was received at the regional laboratory on August 17, 1983, and the contents were analyzed on the next day.

A week later, on August 22, 1983, undercover officer Harris, detective Irvin and the informant returned to the address. This time, Harris purchased a $100 quantity of the same substance from the defendant Price. The officers returned to the drug unit headquarters, weighed the yellow powder, tested the substance with a cobalt reagent, placed the powder into an evidence envelope, initialed and sealed the envelope, and then placed the packet in the drug unit vault. That envelope was received at the regional crime laboratory on August 24, 1983, and the contents were analyzed that same day.

It was the testimony of officer Harris that the purpose of the evidence bag was to protect the chain of custody. He did not know, once the evidence was placed in the vault at the drug unit headquarters, how it got to the crime laboratory. The vault, however, is locked until the next day when the drugs are forwarded to the crime laboratory. There was other evidence through crime laboratory chemist, Mano Kattija-ari, that according to usual procedure, the substance is delivered to the crime laboratory by personnel of the police property room [each identified by an attached inventory sheet], and is received at the crime laboratory by one of the three chemists. The evidence is logged in a record book at the laboratory, and then is placed in the chemistry security vault. In the morning, the evidence is taken into the crime laboratory for analysis. The chemist proceeds only if satisfied that the package has not been tampered with.

The witness confirmed that the first packet [Exhibit 3] was received by the laboratory on August 17, 1983, and was analyzed on August 18, 1983. The second packet [Exhibit 4] was received on August 24, 1983, and was analyzed on that same day. The chemist found both substances to be phencyclidine. The first batch, Exhibit 3, weighed .1 gram and the second, Exhibit 4, weighed .3 grams after analysis was completed. Exhibit 3 weighed .3 grams and Exhibit 4 weighed .7 grams when the police assessed the packets. The chemist testified that the difference in weights was due to several factors: (1) the police weighed both the powder and the container, while the chemist weighed only the powder; (2) the police used a different scale; (3) some of the powder is dissipated by the process of analysis.

It is the contention of the defendant Price that the prosecution failed to establish the chain of custody for either of the two packets, received as Exhibit 3 and Ex-

hibit 4—and for two reasons. First, the prosecution "did not explain who transported the envelopes of drugs from the Police Drug Unit Headquarters vault to the Regional Crime Laboratory." Second, the weights of the two drug packets differed from the time they were at the drug unit to the time the chemist weighed them at the crime laboratory.

■ It is a principle of proof that when demonstrative evidence is offered, an adequate foundation for admission requires that the object offered is the object in controversy and remains in a condition substantially unchanged. The foundation entails the testimonial delineation of the chain of custody of the item with sufficient completeness " 'to render it improbable that the original item has either been exchanged with another or has been contaminated or tampered with.' " *Storm v. Ford Motor Company*, 526 S.W.2d 875, 878[1, 2] (Mo. App.1975) (citing C. McCormick on Evidence, p. 527–8 (2d ed. 1972)). Our decisions postulate the rule that a chain of evidence is sufficiently traced where the circumstances give a reasonable assurance that the item was the same and in the same condition. *Id.* at 878[3]. It is unnecessary to that proof that the police account for "every hand-to-hand transfer" of the item; it is sufficient if the evidence demonstrates a reasonable assurance that the condition of the item remains the same from the time it was obtained until its introduction at trial. *State v. Starr*, 676 S.W.2d 311, 312[1] (Mo.App.1984).

■ The evidence traces, prima facie, a complete chain of custody from the time the substances were purchased from the defendant Price until the substances were presented as demonstrative evidence at the trial. There was testimony that as a regular procedure the packets of evidence were transported by police personnel from the property room at the drug unit headquarters to the regional crime laboratory, each separately identified by an appended inventory sheet. There was testimony that as to Exhibit 3 and Exhibit 4 specifically, chemist Kattija-ari received them from the police drug unit property room in the usual manner [with inventory sheets appended], recorded their description in the log book, initialed the evidence, placed the packets in the vault, and then removed them for analysis. That was the same evidence presented at the trial. That proof dispels any contention of lapse in the concatenation of custody of the items between the police drug unit and the regional crime laboratory. It suffices, rather, to authenticate that the items offered in evidence are the items in controversy—the drugs sold by the defendant—and so to qualify the items as demonstrative evidence at the trial. *Storm v. Ford Motor Company*, 526 S.W.2d at 878[1–5].

■ Nor does the apparent discrepancy between the weights ascribed to each packet by the police drug unit and the regional crime laboratory undermine the foundation for the admission of Exhibit 3 and Exhibit 4, where the testimony otherwise gives a reasonable assurance that the items remained the same and essentially in the same condition. This testimonial discrepancy bears on the ultimate authenticity of Exhibit 3 and Exhibit 4 as the forbidden substances illicitly sold by the defendant, and so is for the jury. *State v. Smith*, 688 S.W.2d 813, 815[2] (Mo.App.1985); *Storm v. Ford Motor Company*, 526 S.W.2d at 879[7, 8].

■ The chemist Kattija-ari employed the gas chromatography mass spectrometry machine to analyze the substances. He described that method of analysis as "a very powerful technique, a powerful technique, ... accepted in established orthodox chemical community everywhere in the world." He then explained the operation of the device from the introduction of a sample solution of the substances into the machine to the sequence of computer analysis during the seventeen minute span of the test process. He gave opinion that the substances tested from Exhibit 3 and Exhibit 4 were phencylidine.

The defendant argues that the opinions were incompetent because the witness could not testify "as to how the machine actually worked nor that in fact it was working correctly." In fact, the witness did testify "as to how the machine actually worked"—and in full, even technical, detail. The complaint is, rather, that the witness could not testify that the machine—the test

procedure—was "functioning properly," and hence his opinion of the test results was not competent. The testimony was actually that the witness was an expert in drug and chemical analysis, was a physical chemist with a master's degree in chemistry. His work was to submit drugs delivered to the crime laboratory to analysis, a work he performed eight to ten times a day. Ten percent of these analyses involved phencyclidine. There was extensive inquiry into the knowledge of the witness in the use and working order of the machine, and his responses established that on the dates of the tests of the contents of Exhibit 3 and Exhibit 4, the mechanism indeed functioned properly. The testimony established a prima facie proof of the reliability and accuracy of the test mechanism and procedure. *State v. Stevens,* 467 S.W.2d 10, 23[14] (Mo.1971).

It is the accepted rule that the results of a scientific test and the opinion of an expert based upon such a test may be admitted as evidence only if the principle involved has general acceptance in that scientific community. *State v. Smith,* 637 S.W.2d 232, 236[3, 4] (Mo.App.1982). The defendant argues that there was no evidence that the test procedures relied on by the chemist for his opinion as to the nature of the substances the tests identified were generally accepted in the scientific community, and hence the opinions were not competent evidence. The effect of the testimony was to the contrary. The witness described mass spectrometry/gas chromatography as "a very powerful technique, accepted in established orthodox chemical community everywhere in the world" for tests such as he conducted. The mass spectrometer and gas chromatograph, as expert Kattija-ari explained, incorporates two functions into one system. The gas chromatograph separates a sample into separate compounds, and as the compounds emerge from that device, they diffuse into the mass spectrometer which records their molecular weight and fragmentation pattern on a chart recorder. The gas chromatograph/mass spectrometer system used by the regional crime laboratory—as do many such systems—include a computer adjunct which stores data on the mass spectra of numerous chemicals. The computer compares the mass spectrum of the chemical under analysis with the numerous mass spectra stored, and thus enables a positive scientific identification of the sample under analysis. *See* Scientific and Expert Evidence 482 (Edward J. Imwinkelried 2d ed. 1981).

The reported decisions and authorities confirm that the mass spectrometry and gas chromatography technique is an extremely reliable specific test for the measurement, separation and identification of particular organic compounds—drugs, among them. Annotation, 23 ALR 4th 1199, 1235 § 15 (1983); *United States v. Distler,* 671 F.2d 954, 962[6] (6th Cir.1981); *Edwards v. United States,* 483 A.2d 682, 685[4] (D.C.App.1984); *State v. Garza,* 704 P.2d 944, 950[15] (Idaho App.1985); *State v. Perryman,* 520 S.W.2d 126, 129[6] (Mo.App.1975); *North Carolina v. McDougall,* 38 N.C. 1, 301 S.E.2d 308, 314[1–3] (1983).

The judgments of conviction are affirmed.

All concur.